UNITED STATES of America, Plaintiff,

v.

MISSOURI PACIFIC RAILROAD COMPANY, and the Texas and Pacific Railway Company, Defendants.

No. 76–402C(4).

United States District Court, E. D. Missouri, E. D.

July 14, 1976.

William G. Cole, Asst. U. S. Atty., St. Louis, Mo., Rex E. Lee, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for plaintiff.

R. W. Yost, St. Louis, Mo., for defendants.

## MEMORANDUM

NANGLE, District Judge.

This matter is before the Court upon cross motions for summary judgment. Plaintiff brought suit herein, pursuant to the Federal Railroad Safety Act of 1970, 45 U.S.C. § 439, and 28 U.S.C. §§ 1337, 1345, seeking declaratory and injunctive relief. Plaintiff contends that defendants have refused to allow employees of the Federal Railroad Administration to conduct safety inspections except upon specified conditions. Accordingly, plaintiff seeks to enjoin defendants' actions, and further seeks a declaratory judgment that plaintiff need not comply with the conditions upon entry imposed by defendants.

Originally, this matter was presented to the Court upon plaintiff's motion for preliminary injunction; the parties agreed, however, to proceed by way of cross motions for summary judgment.

The undisputed facts establish the following:

(1) The Federal Railroad Safety Act of 1970, 45 U.S.C. § 421 et seq., was enacted to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials. 45 U.S.C. § 421.

Legislative history indicates that the major causes of train accidents are human error, defective equipment, and defective tracks and roadbeds. See generally U.S.Code Cong. and Admin.News p. 4104 et seq. (91st Cong.2d Sess.).

(2) Under the provisions of the Federal Railroad Safety Act, the Secretary of Transportation is authorized to perform such acts including, but not limited to, conducting investigations, making reports, issuing subpenas [sic], requiring production of documents, taking depositions, prescribing record-keeping and reporting requirements, carrying out and contracting for research, development, testing, evaluation, and training . . . and delegating to any public bodies or qualified persons, functions respecting examination, inspecting, and testing of railroad facilities, equipment, rolling stock, operations, or persons, as he deems necessary to carry out the provisions of this subchapter. 45 U.S.C. § 437(a).

Employees of the Secretary "are authorized to enter upon, inspect, and examine rail facilities, equipment, rolling stock, operations, and pertinent records at reasonable times and in a reasonable manner". 45 U.S.C. § 437(c).

(3) With a single exception not relevant herein, the Secretary of Transportation has delegated to the Federal Railroad Administrator the responsibility for carrying out the Secretary's functions under the Act. 49 C.F.R. § 1.49(n). The Administrator has promulgated relations to implement the Act. See 49 C.F.R. Part 213, setting forth the minimum safety requirements for railroad track.

(4) The Federal Railroad Administration ["FRA"] owns two railroad cars which have been converted into track geometry measurement vehicles designed to inspect track safety. These vehicles must be hauled by a standard diesel locomotive on nonelectric track lines.

(5) The FRA has contracted with Ensco, Incorporated to perform certain functions involving these special vehicles.

(6) The FRA uses these vehicles as part of a track-testing program, operated over various routes of the National Railroad Passenger Corporation ["Amtrak"]. One such route is between Kansas City, Kansas and Laredo, Texas via St. Louis, Missouri and Dallas-Fort Worth, Texas.

(7) The anticipated results of the inspection program include not only safety consid-

erations but also " . . . railway maintenance, improv[ed] ride quality for passengers and freight, and . . . improved conventional railroad equipment". Track Measurement for Today's Railroad Systems, p. 8. Such results clearly benefit both the government and the railroads.

(8) The FRA assumes, during the course of the inspection, costs incurred by the railroads as follows:

(a) Salary and wages for the train and engine crews. This cost included directly related deadheading, lodging, and the proportional payroll additive expenses for retirement, insurance and vacation provisions relating to those wages.

(b) Supplies furnished to FRA at FRA request such as fuel, water, electricity and other similar supplies.

(c) Costs arising from carrier actions at FRA request to service and/or repair the equipment will be paid at published rates.

(d) Costs relating to security measures taken to protect this equipment when requested by FRA.

(e) Costs relating to the non-operation movement of the inspection vehicles, including terminal usage, interchange fees, switching charges and deadheading movement at the published rates.

(9) Defendant Missouri Pacific Railroad Company is a common carrier by rail under the Interstate Commerce Act, 49 U.S.C. § 1 *et seq.* and operates over rail highways in the state of Missouri. Defendant The Texas and Pacific Railway Company is a common carrier by rail under the Interstate Commerce Act, 49 U.S.C. § 1 *et seq.* and is controlled by defendant Missouri Pacific through ownership of stock and substantial identity of management structure. Texas and Pacific is an integral part of the Missouri Pacific system.

(10) On March 19, 1976, J. W. Gessner, Vice President of Operations for defendants, received a letter from Robert H. Wright, Acting Associate Administrator for Safety, which stated that the FRA planned to inspect the Missouri Pacific tracks from Kansas City, Kansas to Laredo, Texas beginning on April 6, 1976.

(11) On March 22, 1976, Mr. Gessner by reply letter requested postponement of the inspection until the parties could "work out terms of operation agreeable to both of us".

(12) On April 5, 1976, representatives of the FRA and Ensco met with representatives of defendants in St. Louis, Missouri. The FRA representatives explained that the train would operate as a passenger extra at passenger train speeds, three days per week, approximately 300 miles per day. Amtrak's locomotive would haul the test vehicles and defendant railroads were to supply the crews.

(13) Counsel for defendant requested details of insurance coverage with respect to these operations. Ensco's insurance coverage, obtained at FRA's direction but not required either by statute or rule, extends protection for liability only to Ensco and any Class I railroad operating within the United States. Defendants are encompassed in the latter description. Under the terms of the policy, one assured can claim against another assured. The policy limit is $3,000,000 with $250,000 deductible. Plaintiff has stated that this

> form of coverage was originally obtained while the track inspection vehicles were in a purely developmental stage. The policy remains in force even though the inspection program is fully operational only as a matter of administrative convenience until a new policy which will not protect a carrier from its own negligence can be obtained.

(14) On April 6, 1976, Mr. Wright of the FRA informed Mr. Gessner by telegram that any liability on the part of the FRA stemming from the inspection operation would be governed by the terms of the Federal Tort Claims Act. See 28 U.S.C. § 1346, § 2671, *et seq.*

(15) On April 16, 1976, in response to an FRA telegram of the previous day, Mr. J. H. Lloyd, President of defendant railroads advised the FRA that the inspection could

be carried out if the FRA were to supply its own crew, pay for the operation of the train at published tariff rates, or provide insurance coverage.

(16) Although defendants insist that the FRA could safely and economically provide crews to operate the train, the affidavit of Wallace F. Holl, Special Assistant to the Associate Administrator, Office of Safety, Federal Railroad Administration states that it was the determination of the FRA that railroad employees be used as crew. This determination was the result of the belief that safety operation of the train required operation by personnel familiar with the tracks and local operational rules. In addition, the FRA does not presently maintain crews. Were such crews in existence, FRA would still be required to obtain the services of the pilot crew, thus incurring expenses both for its crew and the pilot crew provided by defendants.

(17) Upon receipt of Mr. Lloyd's response to the FRA communication of April 15, 1976, the Administrator requested that this suit be instituted.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter and the parties to this suit. 45 U.S.C. § 439, 28 U.S.C. §§ 1337, 1345.

Defendants argue that they are in fact not prohibiting the FRA from inspecting the tracks but are willing to permit inspection if their conditions are met. The Court concludes that the imposition of these conditions, as conditions precedent to entry, constitute a refusal to allow inspection.

The FRA is authorized by statute and regulation to conduct investigations and tests of railroad facilities. 45 U.S.C. § 437, 29 C.F.R. § 1.49(n). Of necessity, the railroads must be involved in the inspections since it is the railroad's property which is the subject of the inspection. The only objection which defendants have raised concerns the propriety of the FRA requirement

that the railroads assume liability for their own negligence during the course of inspection.[1] All direct costs are borne by the FRA and defendants are protected from liability for the negligence of Ensco and the FRA by insurance and by statute. The Court is of the conclusion that the requirement that the railroads assume responsibility for their own negligence is reasonable and accordingly will grant plaintiff relief.

■ The congressional purpose in enacting the Federal Railroad Safety Act of 1970 was a benign one, and therefore, the statute should be liberally construed. 45 U.S.C. § 421; *cf., Lilly v. Grand Trunk Western Railroad Co.,* 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943); *United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). Historically, railroads have been required to bear costs necessitated by "local transportation needs . . . further safety and convenience . . .". *Atchison, Topeka & Santa Fe Railway Co. v. Public Utilities Commission of California,* 346 U.S. 346, 352, 74 S.Ct. 92, 98 L.Ed. 51 (1953); *Erie Railroad Company v. Board of Public Utility Commissioners,* 254 U.S. 394, 41 S.Ct. 169, 65 L.Ed. 322 (1921); *Erie Railroad Company v. Williams,* 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155 (1914); *Wisconsin, Minnesota and Pacific Railroad v. Jacobson,* 179 U.S. 287, 21 S.Ct. 115, 45 L.Ed. 194 (1900). It is only when "a regulation . . . is so arbitrary and unreasonable . . ." that due process considerations will prevent its enforceability. *Chicago, Rock Island & Pacific Railway Co. v. United States,* 284 U.S. 80, 97, 52 S.Ct. 87, 92, 76 L.Ed. 177 (1931).

It is obvious that the benefits of the inspections inure not only to the public but to the railroads as well. The only costs which the railroads must assume are the remote costs of its own negligence. The allocation of these costs to the railroads is clearly not unreasonable.

■ Having found that the FRA can reasonably require defendants to assume re-

1. The Court notes that defendants have not argued that the terms of the inspection, as established by the FRA, contravene any re-

quirements relating to the enactment of rules or regulations. See, e. g., 45 U.S.C. § 431.

sponsibility for their own negligence in the course of the safety inspections authorized by statute, the Court concludes that the possibility that alternative means of conducting the investigations exist does not prevent the FRA from proceeding with its mode of inspection. Therefore, the Court will grant plaintiff's motion for summary judgment and issue the requested relief.