**UNITED STATES of America, Appellee,**

v.

**MISSOURI PACIFIC RAILROAD COM-PANY and the Texas and Pacific Railway Company, Appellants.**

No. 76–1653.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 17, 1977.

Decided April 20, 1977.

---

R. W. Yost, St. Louis, Mo., for appellants; Mark M. Hennelly, St. Louis, Mo., on brief.

Paul M. Tschirhart, Atty., U. S. Dept. of Justice, Washington, D. C., for appellee; Rex E. Lee, Asst. Atty. Gen., Barry A. Short, U. S. Atty., John H. Broadley, Washington, D. C., on brief.

Before CLARK, Associate Justice, Retired,* GIBSON, Chief Judge, and HEANEY, Circuit Judge.

HEANEY, Circuit Judge.

Congressional concern over the rapid increase in railroad accidents and the damage threatened by the release of volatile or explosive substances during such incidents lead to the enactment of the Federal Railroad Safety Act of 1970. 1970 U.S.Code Cong. and Admin.News, pp. 4104, 4105. The authority of the Secretary of Transportation or his agents to inspect and evaluate railroad track and roadbeds is an integral feature of the legislative scheme. *See* 45 U.S.C. § 437(a). It enables the Secretary to detect accident-causing hazards and to use this information to issue appropriate maintenance orders or safety-related rules and regulations. To carry out its inspection authority, the Administrator of the Federal Railway Administration (FRA) developed a track measurement program which utilizes two test cars to measure track sections and records all detected imperfections. Since April, 1975, the FRA has inspected thousands of miles of track under the measurement program. All railroads previously inspected have supplied train crews to operate the two test cars and assumed liability for their negligence.

On March 19, 1976, Missouri Pacific Railroad Company (MoPac) was informed by letter that the FRA planned to inspect MoPac's tracks under the measurement program. MoPac requested a meeting with FRA officials to discuss the nature and terms of the inspection. At this meeting, the parties were unable to resolve differences over the risk of liability for accidents arising out of the negligence of crew members. On April 15, 1976, MoPac advised the FRA that the inspection could proceed if the FRA supplied its own crew or provided insurance coverage for crew members provided by MoPac. Upon receipt of this response, the government sought an injunction against MoPac and a declaratory judg-

---

* TOM C. CLARK, Associate Justice, Retired, Supreme Court of the United States, sitting by designation.

ment that the FRA need not comply with the stated conditions. The District Court concluded that the FRA could require Mo-Pac to provide the crew to operate the test cars and to assume liability for accidents arising out of their negligence. *United States v. Missouri Pac. R. Co.*, 417 F.Supp. 312 (E.D.Mo.1976).

MoPac's appeal of the District Court's decision poses two issues: (1) whether in the performance of its statutorily mandated inspection responsibilities, the FRA is authorized to compel regulated railroads to bear the risk stated above, and (2) whether in adopting this cost-sharing practice, the FRA was required to follow a formal hearing and rule-making procedure.

Section 431(a) of the Act empowers the Secretary of Transportation[1] to prescribe appropriate rules, regulations and standards for all areas of railroad safety, 45 U.S.C. § 431(a)(1), and to conduct necessary research, testing and evaluation. 45 U.S.C. § 431(a)(2). The statute is explicit in requiring that hearings precede all rule-making or standard development authorized by § 431(a)(1), 45 U.S.C. § 431(b), but no similar requirement attends the exercise of investigatory powers. Section 432 dispenses with the hearing requirement and enables a more immediate response to emergency situations if inspection tests reveal an unsafe condition which threatens death or injury to persons. 45 U.S.C. § 432. The Secretary may prohibit further use of a particular facility based solely on the results of an inspection program. Affected parties may request subsequent review of the Secretary's order in an adjudicatory proceeding. *Id.* Section 437(a) vests the Secretary with broad investigatory powers to perform the fact-finding needed for rule-making under § 431(a) and the detection of emergency hazards under § 432. 45 U.S.C. § 437(a). Under § 439(a), the Secretary is empowered to seek injunctive relief to restrain violations of the Act. 45 U.S.C. § 439(a).

It seems clear that the Act's principal goals cannot be accomplished without an effective inspecting and fact-finding program. A House Report on the bill reveals Congress's particular concern over the rash of recent accidents involving volatile and explosive substances. 1970 U.S.Code Cong. and Admin.News, pp. 4104, 4105, 4107. Prevention and cure of such accidents, however, is possible only through the implementation of an inspection program aimed at advance detection of potential hazards. In this way, the prevention of similar disasters is dependent on the Secretary's inspection authority. Similarly, the Secretary's plenary authority to promulgate rules and standards in all areas of railroad safety cannot be effectively performed without adequate information developed from testing and evaluation.

 Section 437(c) provides:

To carry out the Secretary's * * * responsibilities under this subchapter, * * * agents of the Secretary * * are authorized to enter upon, inspect, and examine rail facilities, equipment, rolling stock, operations, and pertinent records *at reasonable times and in a reasonable manner.* (Emphasis added.)

45 U.S.C. § 437(c).

Since the goals of the Act are remedial in nature, we must construe the statute liberally. 45 U.S.C. § 421. *Lily v. Grand Trunk Western Railroad Co.*, 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943); *United States v. California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). In light of Congress's clear intent to grant plenary authority in this area and in light of the critical role inspection programs play in the accomplishment of this goal, we hold that the underlined passage countenances reasonable cooperation by inspected railroads. Thus, we must determine whether it is reasonable for the FRA to require that MoPac provide

---

1. The Secretary has delegated to the Administrator of the Federal Railway Administration the authority to carry out the functions vested in him by the Federal Railroad Safety Act of 1970. 49 C.F.R. § 1.49(n). When we refer to

the powers entrusted to the Secretary under the Act, it should be understood that the FRA is now performing them as the Secretary's agent.

crew members for the test cars and assume liability for their negligence during the inspection.

At the outset, we should note that both the public and the railroads benefit substantially from the FRA's inspection program. As the District Court concluded, the anticipated results "include not only safety considerations but also '. . . railway maintenance, improv[ed] ride quality for passengers and freight * * *'." *United States v. Missouri Pac. R. Co., supra* at 417 F.Supp. 313–314. MoPac's contentions regarding cost must, in our view, be considered in light of the substantial benefit they stand to gain from cooperating in the program.

■ Even though the inspected railroad derives considerable benefit from the program, the FRA assumes virtually every identifiable cost of operation including the following:

(1) Salary and wages for the train and engine crews. This cost includes directly related deadheading, lodging, and the proportional payroll additive expenses for retirement, insurance and vacation provisions relating to those wages.

(2) Supplies furnished to FRA such as fuel, water, electricity and other similar supplies.

(3) Costs arising from carrier actions to service or repair the equipment.

(4) Costs relating to security measures necessary to protect the equipment.

(5) Costs relating to the nonoperation movement of the inspection vehicles, including terminal usage, interchange fees, switching charges and deadheading movement at the published rates.

*United States v. Missouri Pac. R. Co., supra* at 417 F.Supp. 313–314.

For the most part, these are reimbursement-type costs; that is, they are paid to make the railroad "whole" for most expenses incurred while operating the inspection program. The only costs MoPac must bear are those caused by the negligence of its crew members. There are several rea-

sons why we feel it is not unreasonable for MoPac to bear this expense. First, the likelihood of an accident payout is minimal. The test vehicle proceeds at a normal rate of speed, is only two cars in length, and requires few crew members. The testing procedure is not a hazardous one and involves no new risks for MoPac crew members. Second, MoPac's past accident payout record suggests that their risk of liability is insubstantial. MoPac self-insures for liabilities under $5 million. Its accident payouts approximate 1.0% of its gross operating revenue. MoPac estimates that it would cost them $87,000 to provide the testing service as a common carrier. Of this $87,000 figure, less than $1,000 would be attributable to accident payouts. Finally, safe performance of the testing operation is probably best insured by imposing liability on MoPac for the negligence of its crew members. The risk of loss may help insure careful selection and proper supervision of the crew members.

MoPac argues that its insurance-related expenditures would be unnecessary if the FRA supplied its own crew to operate the test vehicle. This was an alternative that the FRA could have adopted, but its failure to do so was ˆnot unreasonable. Safety problems might arise if FRA crews operated the test cars over track unfamiliar to them. Moreover, it is conceded that if FRA supplied a crew, the railroad would have to provide an experienced engineer and conductor to give instructions; and if they gave negligent advice, MoPac might well incur liability for injuries proximately caused.

■ We next consider whether the practice of requiring crew members from inspected railroads should have been adopted through the promulgation of a rule after opportunity for hearing. In essence, MoPac contends that the term "reasonable" in § 437(c) is so broad that the Administrator ought to have better defined its scope through the rule-making process. We agree that the Administrator might have proceeded in this manner and believe he should have if he intended the railroads to

bear a significant portion of the costs. However, the Administrator decided to give a very narrow meaning to the term "reasonable" and to have the government assume virtually all costs of the testing procedure. Also, legislative history reflects Congress's concern that inspection commence as soon as possible. Under these circumstances, we do not believe formal rule-making was necessary. *See* K. Davis, *Discretionary Justice* 52 (1969).

For these reasons, we affirm the decision of the District Court.