**ASSOCIATION OF AMERICAN RAILROADS, Plaintiff,**

v.

**Brock ADAMS, Secretary of Transportation, Defendant.**

**Civ. A. No. 78–1184.**

United States District Court, District of Columbia.

Sept. 12, 1978.

**1080**

Lee A. Monroe, Thomas Phemister, Washington, D. C., for plaintiff.

William Briggs, Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This action was initiated upon a motion for a temporary restraining order filed by plaintiff Association of American Railroads (hereinafter referred to as "AAR") challenging both the substantive and procedural legality of certain rear end train-marking regulations promulgated by the Federal Railroad Administration (hereinafter referred to as "FRA"). Plaintiff's motion for a temporary restraining order was denied, after argument, by the Court. Shortly thereafter, AAR's motion for a preliminary injunction was also denied, the Court finding, among other things, that plaintiff had failed to demonstrate its likelihood of prevailing on the merits or to present a substantial case on the merits. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 182 U.S.App.

D.C. 220, 559 F.2d 841 (D.C.Cir.1977) and *Virginia Petroleum Jobbers Association v. F.P.C.*, 104 U.S.App.D.C. 106, 259 F.2d 921 (D.C.Cir.1958).

The case is now before the Court on plaintiff's motion for summary judgment and intervenors'[1] and defendants'[2] joint cross-motion for summary judgment. Upon consideration of these motions, memoranda submitted in support thereof and the entire record, the Court finds that the defendants and intervenors are entitled to judgment as a matter of law.

*Background*

The FRA regulations at issue were promulgated only after a lengthy administrative and legislative process which commenced with the enactment of the Federal Railroad Safety Act of 1970, 45 U.S.C. §§ 431–441. Section 431(a) of the Act grants the Secretary of Transportation broad authority to "prescribe, as necessary, appropriate rules, regulations, orders and standards for all areas of railroad safety." The Secretary of Transportation then delegated this comprehensive authority to the Administrator of the Federal Railroad Administration. *See* 49 C.F.R. § 1.49. In 1973 the FRA commenced rulemaking concerning rear end marking of passenger trains in which all parties to this litigation participated, both by submission of written comments and by oral presentation at the hearing. At this time the FRA was considering both active (lighted) and passive (reflective) markers and determined that additional field testing and data collection were required prior to the promulgation of final regulations. AAR opposed the rule proposed by the FRA in its entirety.

On September 20, 1974, the UTU petitioned the FRA to institute rulemaking requiring placement of highly visible, lighted markers on the rear end of freight trains. In February of 1975, the FRA gave public

---

1. The motion of the Railway Labor Executives Association (hereinafter referred to as "RLEA") and the United Transportation Union (hereinafter referred to as "UTU") was orally granted at the hearing on the temporary restraining order.

2. The defendants in this case are Brock Adams, Secretary of Transportation, and John M. Sullivan, Federal Railroad Administrator.

notice that it was considering rulemaking on the UTU petition and solicited public comments but, as in the 1973 rulemaking procedure, no further action was taken. Once again, the AAR opposed the institution of such rulemaking. Thus, despite the institution of two separate rulemaking proceedings, the FRA had failed to impose mandatory rear end marking devices on either passenger or freight trains.

Meanwhile, legislative consideration of railroad safety resumed and in 1976 Congress passed an amendment to the Federal Railroad Safety Act of 1970 which, among other things, required the Secretary of Transportation to issue, within 180 days of enactment,

> such rules, regulations, orders and standards as may be necessary to require that—
>> (2) the rear car of all passenger and commuter trains shall have one or more highly visible markers which are lighted during periods of darkness or whenever weather conditions restrict clear visibility; and
>> (3) the rear car of all freight trains shall have highly visible markers during periods of darkness or whenever weather conditions restrict clear visibility.

45 U.S.C. § 431(g).[3] In addition, the 1976 amendment included a limitation of the preemptive effect of the mandated regulations if the FRA decided to require passive devices for freight trains.

On November 17, 1976, the FRA published a notice of proposed rulemaking on the subject of rear end marking devices for passenger, commuter and freight trains, while incorporating the two earlier rulemaking procedures. In that notice the FRA recognized its discretion to treat passenger and freight trains differently while stating:

"The distinction in the language used in each of these subsections [subsections (2) and (3) of 45 U.S.C. § 431(g)] leads to the conclusion that Congress intended to allow for different means of marking the rear end of passenger and commuter trains on the one hand, and freight trains on the other." 41 Fed.Reg. 50702.

The proposal set forth in the public notice of rulemaking contemplated the use of passive marking devices for freight trains and noted its belief that existing reflective technology could meet the statutory standard set forth by 45 U.S.C. § 431(g). The AAR, however, opposed the tentative performance standard because it believed the standard to be too stringent. See comments of the AAR on Notice No. 1, FRA Docket No. RSRM–1 (December 17, 1976). With the exception of limited comments directed to the absence of an economic impact statement, AAR failed to exercise its right to comment on the subject matter of the FRA rulemaking.

At the public hearing of December 3, 1976, the AAR representative declined to participate though individual railroads presented oral testimony. The UTU representative argued for the use of lighted marking devices on all trains.

Written comments submitted to the FRA pointed out that the proposed performance standard, written in terms of straight track and clear weather conditions, would fail to assure safe railroad operation in those areas which include hills and curved track, thus falling short of the statutory mandate requiring that markers be highly visible "during periods of darkness or whenever weather conditions restrict clear visibility." These comments point to what is the crucial issue in this litigation—whether reflective materials can be considered "highly visible" under all conditions within the meaning of the statute.

---

**3.** The report of the House Committee on Interstate and Foreign Commerce explains the need for the 1970 amendment as follows:

> "Section 5(b)(1) is another area of safety regulation which the Committee felt needed prompt attention. One of the railway labor organizations over a year ago filed a petition

with FRA to require lighted markers on the rear of all trains. That docket is designated as FRA Rule Making Petition Docket No. 74–5. FRA still has not promulgated a rule covering rear end markers."

House Report No. 94–1166 on HR 11804, 94th Cong., Sec. Sess. at p. 13 (1976).

After full ventilation of the issues and problems involving the proposed standard, the FRA revised its initial proposal and issued a final rule on January 6, 1977. The final rule set forth a performance standard which the FRA believed was responsive to the statutory mandate by providing a measure for those devices which could be considered "highly visible" during periods of reduced and restricted visibility. Though the FRA left the issue open, it noted that reflective substances then in existence would in all likelihood fail to meet the performance standard. *See* 42 Fed.Reg. 2324. This final rule was to be in effect December 31, 1977, thereby giving the railroads nearly one year to comply.

The AAR's initial petition for reconsideration was denied in April, 1977. Meanwhile, the FRA continued on its own to research and investigate marking devices having the potential to meet the performance standard. The FRA also observed and considered a AAR–3M Company demonstration of the qualities of retroflective materials. Finally, on December 8, 1977, the FRA amended the final rule by making procedures whereby railroads could submit marking devices for FRA approval and postponed the effective date of the regulations to July 1, 1978. *See* 42 Fed.Reg. 62007.

On February 8, 1978, the AAR again petitioned the FRA for reconsideration of its final rule. A carefully detailed denial was sent to AAR on June 1, 1978. AAR then filed this action several days prior to the July 1, 1978 effective date of the final rule, challenging on several grounds the validity of the FRA rear end marking regulations concerning freight trains. AAR's petition to have the enforcement of these rules temporarily and preliminarily enjoined was denied by this Court.

I. The Regulations Promulgated by the FRA are Valid Under 45 U.S.C. § 431(g).

*Statutory Construction*

The federal defendants argue that the Court may uphold the action of the FRA as within the general rulemaking authority conferred by 45 U.S.C. § 431(a) or as being within the specific mandate of the 1976 amendment. The AAR, however, asserts that the validity of the FRA's action must be tested under Section 431(g). The Court agrees with the position taken by the AAR but does not base its conclusion upon the decisions cited by petitioner: *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) and *Doraiswamy v. Secretary of Labor,* 180 U.S.App.D.C. 360, 368, 555 F.2d 832, 840 (D.C.Cir.1976). Both of these cases involved findings of fact, not interpretations of law. In fact, *Chenery* allows a reviewing tribunal to affirm a lower court or agency decision on grounds wholly different from those relied upon below. *See Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 603 (1937). It does, however, clearly appear that Congress chose to preempt the general rulemaking authority of Section 431(g) and therefore the action of the FRA must be tested under the latter section. Section 431(a) does, however, remain relevant to the proper construction of Section 431(g).

When properly framed, the crucial issue of this litigation becomes relatively easy to resolve: "Did Congress, in enacting the 1976 amendments, intend to limit the FRA's pre-existing authority and thereby prohibit the FRA from requiring placement lighted marking of freight trains?" The Court concludes that Congress did not intend to do so.

As originally formulated, 45 U.S.C. § 431(a) has been described as a grant of plenary regulatory authority over all areas of railroad safety. *See United States v. Missouri Pacific R.R.,* 553 F.2d 1156 (8th Cir. 1977); *National Association of Regulatory Utility Commissioners v. Coleman,* 542 F.2d 11 (3d Cir. 1976). In enacting railroad safety legislation Congress was well aware of the Supreme Court decisions which have consistently held that such legislation should be liberally construed in order to achieve railroad safety and the protection of railroad employees and the public from unnecessary injury. *See, e. g., United*

*States v. Seaboard Airline Railroad Co.,* 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959). It was in light of the foregoing interpretative background that Congress passed Section 431(g) of the Railroad Safety Act. Clearly, it was not lack of rulemaking authority which gave rise to the 1976 amendments but Congressional desire to see some form of rulemaking accomplished.

■ Petitioner's principal argument is that a specific statute cannot control or nullify a general one, *see Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974) and *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), and that statutes must be interpreted so as to give meaning to all of the words of the statute and to deliberate distinctions drawn by Congress. *See F.T.C. v. Sun Oil Co.,* 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). The Court fully agrees with these canons of statutory interpretation but disagrees with the conclusions drawn by AAR.

It is clear that the use of slightly differing language in two parallel sections of the statute indicates that Congress intended the sections to have different meanings. The Court, however, disagrees with petitioner insofar as this is seen as requiring the results of administrative action to be different as well. The Court reads the Congressional mandate of Section 431(g) as requiring the placement of lighted rearend marking devices on passenger trains and leaving the issue of freight train visibility to the discretion of the Secretary of Transportation—but at the same time requiring him to exercise his discretion within the prescribed period of time.

■ The Court cannot read an unusual intention into a statute unless the language of the statute requires it. *See F.T.C. v. Fred Meyer, Inc.,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). If Congress had intended to otherwise restrict the FRA's broad, pre-existing authority, it surely would have made this intention known, either in the words of the statute which it did not, or in the legislative history.

The Court finds the language of the statute clear and unambiguous and resort to the legislative history supports the Court's conclusion. A thorough search fails to reveal any evidence of legislative intent differing from the Court's conclusion that Section 431(g)(3) left the issue of freight car marking to the reasoned discretion of the Secretary. Rather, excerpts from the legislative history cited in the memoranda submitted by the parties consistently indicates legislative withdrawal from the subject of freight train marking.

*Scope of Review*

■ The rules now under judicial review were not required by Congress to be made on the record after agency hearing so compliance with the notice and comment provisions is all that is necessary in this informal rulemaking procedure. See 5 U.S.C. § 553(b) and (c). The appropriate scope of review is a narrow one, limited to whether the agency's determination is arbitrary, capricious or not in accordance with law. Where any agency has adhered to proper procedures in arriving at its decision, reviewing courts may only determine whether the action taken has a rational basis. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). AAR's complaint at ¶ 25 and memorandum concede that the "arbitrary and capricious" standard is the appropriate scope of review.

Under the rational basis standard of review this Court is counseled by the following statement of the United States Supreme Court in *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1971):

> We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusion only to ascertain that the latter are rationally supported.

*See also Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419

U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Mississippi Valley Barge Line Co. v. United States,* 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); *Ethyl Corporation v. Environmental Protection Agency,* 176 U.S. App.D.C. 373, 541 F.2d 1 (D.C.Cir.1976).

■ The FRA clearly possesses expertise in the area of railroad operations, particularly on the subject of safety regulations. Accordingly, great deference must be accorded to the exercise of its discretion in this area and "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). This Court is not even tempted to do so.

■ The FRA's rulemaking decision to require lighted marking devices on freight trains is amply supported by sound reasons. Adequate marking of passenger trains alone is insufficient to safeguard passenger train movements because on most of the active general rail systems, passenger and freight trains intermingle. Therefore, provision of adequate marking devices on the rear end of passenger trains will not suffice to safeguard passenger trains which follow freight trains.

As the FRA has explained, the revised performance standard was developed to meet problems with restricted vision and light intensity on curved track. 42 Fed. Reg. 62003. Curves in excess of one degree are common on every major railroad in the country. Moreover as the attachments to the federal defendants' memorandum indicate (see Apps. E, F and G), the conclusion is inescapable: lighted markers are effective safety mechanisms on curved track and in hilly areas, whereas reflective safety devices are not.

Finally, the AAR cannot successfully contest the imposition of the rule on the basis of cost of installation. The testimony presented at the hearing on the temporary restraining order indicated that installation cost to each railroad is but a small fraction of total income. Moreover, this Court cannot second-guess the Congressional determination that highly visible rear end marking devices are an essential safety mechanism for all trains. The FRA has properly exercised its discretion in determining that only lighted marking devices are "highly visible" within the meaning of the mandate found in 45 U.S.C. § 431(g).

The Court cannot say that the FRA failed to act in a reasonable manner and to give adequate consideration to all relevant factors prior to promulgation of the final rule. *See P.A.M. News Corporation v. Butz,* 168 U.S.App.D.C. 376, 514 F.2d 272 (D.C.Cir. 1975).

*The FRA Gave Interested Parties Ample Opportunity to be Heard*

■ The Administrative Procedure Act, 5 U.S.C. § 553(b) and (c), as well as agency regulations, 49 C.F.R. § 211, require that interested parties be given notice of "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The Court finds that the FRA fully complied with these procedural requirements.

The notice of proposed rulemaking made known the substance of the rulemaking procedure,—the development of minimum standards for highly visible rear end marking devices for passenger, commuter and freight trains. *See* 41 Fed.Reg. 50701. The notice of rulemaking also indicated that the subject matter contained in the earlier uncompleted rulemaking proceedings (1973 and 1974) were encompassed and subsumed under the present rulemaking. *See* 41 Fed. Reg. 50702. It is important to note that the FRA made known its renewed interest in the prior petition of the UTU which would require lighted markers on freight trains. Plaintiff AAR had participated in these prior rulemakings and contributed to their dockets. See pp. 1080–1081, *supra.* Finally, the notice itself at page 50702 of the Federal Register indicated that reflective devices would be permissible only if they met the performance criteria finally established by the FRA.

■ An agency need not issue a final rule which is essential to the proposed rule. It is clear that agencies require flexibility

in rulemaking so that they may be able to respond appropriately to comments received after ventilation of initial rulemaking proposals. As the Court of Appeals for the District of Columbia observed:

A contrary rule would lead to the absurdity that in rulemaking under the APA the agency can learn from the comments on its proposal only at the peril of starting a new procedural round of commentary.

*International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 428, 478 F.2d 615, 632, n. 51 (D.C.Cir.1973). Even where substantial changes in a proposed rule have occurred, agency action has been upheld. The First Circuit Court of Appeals has refuted an argument similar to that made by petitioner:

Although the changes were substantial, they were in character with the original scheme and were additionally foreshadowed in proposals and comments advanced during the rulemaking. Parties had been warned that strategies might be modified in light of their suggestions.

*South Terminal Corp. v. E.P.A.,* 504 F.2d 646, 658 (1st Cir. 1974). The notice of rulemaking had made clear that the FRA's proposal might be changed after comments were received. 41 Fed.Reg. 50704. The AAR cannot now be heard to claim "surprise", particularly since it declined to fully participate in the rulemaking. Essentially, the AAR asserts the right of a party agreeing with the agency's initial proposal to refrain from commenting thereon and then to insist that the proposed rule not be changed to its detriment. The Court feels compelled to reject this position.

II. The FRA Was Not Required to Prepare an Economic Impact Statement.

■ The Department of Transportation has imposed an internal department policy statement requiring an evaluation of anticipated economic and beneficial impact of proposed regulations. *See* Notice No. 76–5; 41 Fed.Reg. 16200. This Policy statement goes on to provide that an evaluation is not required if "publication of the proposed regulation is expressly mandated by statute." The AAR asserts that the FRA made no

effort to comply with this regulation and that failure to do so necessarily invalidates the regulations. The Court disagrees with the arguments advanced by AAR and finds that the failure of the FRA to make an economic impact analysis does not effect the validity of the final regulations.

■ As a point of departure, the Court is wary of reviewing internal policy matters. It is clear that not everything done by an administrative agency is reviewable under the Administrative Procedure Act. *See, e. g., Straus Communications, Inc. v. FCC,* 174 U.S.App.D.C. 149, 530 F.2d 1001 (D.C.Cir.1971); *Hearst Radio, Inc. v. FCC,* 83 U.S.App.D.C. 63, 167 F.2d 225 (D.C.Cir. 1948). The Court finds that the internal policy statement here at issue has no direct or indirect impact upon outside parties and therefore does not fall within the definition of "agency action" found at 5 U.S.C. § 551(13). Accordingly, the inaction of the FRA is not reviewable under 5 U.S.C. § 702.

The Court also finds the analogy to Executive Order No. 11821 (consideration of the potential inflationary impact of all regulations) to be persuasive and concludes that the agency's failure to comply with an internal departmental directive does not create a private right of action. *See Independent Meat Packers v. Butz,* 526 F.2d 228 (8th Cir. 1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976).

Finally, the Court is cognizant of the Secretary of Transportation's agreement with the FRA's interpretation of the policy statement. It would be ludicrous indeed for the Court to, in effect, overrule the Secretary's interpretation of his own policy directive. *See* 42 Fed.Reg. 2322.

III. A Rule Imposing the Placement of Rear End Lights on all Trains Does not Require an Environmental Impact Statement.

■ The National Environmental Policy Act (hereinafter referred to as "NEPA") specifically requires all federal agencies to include in all "major Federal actions significantly affecting the quality of the human

environment, a detailed statement by the responsible official on . . . the environmental impact of the proposed action." 42 U.S.C. § 4332. The law in this circuit is clear:

> As a general rule, the finding that a given action is not a "major federal action" requiring an environmental impact statement should be supported by the administrator's reasoning. There may, however, be exceptional instances where the fair implication of the situation plainly indicates why an environmental impact statement was not needed.

*Krueger v. Morton,* 176 U.S.App.D.C 233, 238, 539 F.2d 235, 240, 241 (D.C.Cir.1976). Though the facts in *Krueger* are inapplicable to the case at bar, the Court concludes that the action of the FRA is within the exception noted.

The rationale for the general rule regarding preparation of environmental impact statements was succinctly stated by the court in *Scientists' Institute for Public Information, Inc. v. AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (D.C.Cir.1973):

> A statement of reasons will serve two functions. It will ensure that the agency had given adequate consideration to the problem and that it understood the statutory standard. In addition, it will provide a focal point for judicial review of the agency's decision, giving the court the benefit of the agency's expertise.

156 U.S.App.D.C. at 411, 481 F.2d at 1095. The decision in *Krueger v. Morton, supra,* implicitly recognizes that what is "adequate consideration" depends on the facts and circumstances of each case. The Court finds it self-evident that retrofitting 20,000 railroad cars necessary to meet the requirements of the regulations does not rise to the level of a major Federal action significantly affecting the quality of the human environment. The FRA gave ample consideration to the impact of the regulations and their relation to NEPA:

> . . . the FRA has performed a general environmental assessment of the potential effects of safety regulatory actions and has determined that, as a class,

they do not constitute major Federal actions significantly affecting the quality of the human environment. Furthermore, the FRA does not believe that the particular rules included within this Part will have a foreseeably significant impact upon the quality of the human environment, and neither commenter who raised this issue suggested any evidence that such impact does or might in fact exist.

42 Fed.Reg. 2322. The FRA is required to do no more. *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972); *Metlakatla Indian Community v. Adams,* 427 F.Supp. 871 (D.D.C. 1977). It is significant that the AAR has never alleged an impact other than socioeconomic in nature. *See Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Socio-economic factors in themselves have been found insufficient to require an EIS. *See, e. g., Image of Greater San Antonio, Tex. v. Brown,* 570 F.2d 517, 522; *Metlakatla Indian Community v. Adams, supra.* Finally, the Court, under the facts and circumstances before it, fails to see how requiring the FRA to create a record of its expert reasoning regarding NEPA requirements will aid judicial review.

In summary, the Court finds that the intervenors and defendants are entitled to summary judgment because there is no issue of material fact in dispute and the FRA's decision to promulgate a performance standard which would, in effect, require the rear ends of all freight trains be marked with lighting devices is a rational decision made in accordance with law.