**RAILWAY LABOR EXECUTIVES' AS-SOCIATION;  United Transportation Union General Committee of Adjustment, the Southern Pacific Company; Brotherhood of Locomotive Engineers General Committee of Adjustment, the Southern Pacific Company; and Brotherhood of Railroad Signalmen, Plaintiffs–Appellants,**

v.

**James H. BURNLEY ***, Secretary, Department of Transportation; John R. Riley, Administrator, Federal Railroad Administration, Defendants–Appellees.**

No. 85–2891.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 1986.

Decided Feb. 11, 1988.

---

* James H. Burnley is substituted for defendant Elizabeth Dole pursuant to Fed.R.App.P. 43(c)(1).

Lawrence M. Mann, Washington, D.C., for plaintiffs-appellants.

Marc Richman, Daniel Carey Smith, Washington, D.C., for defendants-appellees.

Alan L. Schlosser, San Francisco, Cal., for amicus curiae.

Before TANG, PREGERSON and ALARCON, Circuit Judges.

TANG, Circuit Judge:

The Railway Labor Executives' Association[1] and various railway labor organizations which are constituent members (collectively "RLEA") appeal the district court's grant of summary judgment for the government. RLEA challenges the constitutionality of Federal Railroad Administration (FRA) regulations mandating blood and urine tests of employees after certain train accidents and fatal incidents, and authorizing breath and urine tests after certain accidents, incidents and rule violations. RLEA also argues that the regulations violate provisions of the Railway Labor Act, the Federal Rehabilitation Act and the Federal Railroad Safety Act. We reverse.

## BACKGROUND

The regulations at issue are codified in 49 C.F.R. Part 219 (1986). They were issued by the FRA after a two-year rulemaking process on August 2, 1985 and scheduled to become effective November 1, 1985. RLEA was a party to the administrative proceedings and filed a petition for reconsideration which the Secretary denied on October 28, 1985. It then filed suit in federal district court on October 31, 1985, and received a temporary restraining order prohibiting implementation of the regulations. The TRO remained in effect until the district court granted summary judgment for the government on December 9, 1985. RLEA sought and obtained a stay pending appeal from this court on January 3, 1986 but the Supreme Court vacated the stay on January 27, 1986. *Dole v. RLEA*, 474 U.S. 1099, 106 S.Ct. 876, 88 L.Ed.2d 914 (1986). The regulations thus went into effect February 10, 1986 with mandatory post-accident testing beginning March 10.

The portions of the new regulation which are the subject of this challenge are Subpart C, which requires post-accident testing, and Subpart D, which authorizes testing for "cause." The key provisions are summarized below, and set out in full in the margin.

The provisions of Subpart C mandate alcohol and drug testing for all covered employees involved in various events, including: major train accidents (involving a fatality, release of hazardous material with either evacuation or injury, or $500,000 damage to railroad property); impact accidents (involving a reportable injury[2] or damage to railroad property of $50,000); and fatal incidents (involving fatality of an on-duty railroad employee). 49 C.F.R. § 219.201.[3] The regulations require that

---

1. The RLEA is an unincorporated association representing all crafts of railroad workers in the country.

2. A reportable injury is one which must be reported under Part 225. 49 C.F.R. § 219.5(s). According to 49 C.F.R. § 225.19(d)(4), a reportable injury is one that requires medical treatment or results in restriction of work or motion for one or more work days, one or more lost work days, termination of employment, transfer to another job or loss of consciousness.

3. **§ 219.201 Events for which testing is required.**

    (a) *List of events.* On and after March 10, 1986, except as provided in paragraph (b) of this section, post-accident toxicological tests shall be conducted after any event that involves one or more of the circumstances described in paragraph (a)(1) through (3) of this section:

    (1) *Major train accident.* Any train accident that involves one or more of the following:
        (i) A fatality;

blood and urine samples be taken from all crew members of a train involved in such an accident or incident as soon as possible afterwards. Blood samples are to be taken at independent medical facilities by qualified medical professionals or technicians. 49 C.F.R. § 219.203.[4] Refusal to provide a sample results in a 9 month period of disqualification. 49 C.F.R. § 219.213.[5]

The provisions of Subpart D authorize railroads to require covered employees to submit to breath or urine tests when a supervisor has a reasonable suspicion that an employee is under the influence or impaired by alcohol or drugs. To require a urine test, two supervisors must have reasonable suspicion, and if drug use is suspected, one of them must have been trained in spotting drug use. 49 C.F.R. § 219.301(b)(1),[6] (c)(2) [7]. The railroads may also require testing when an employee is involved in an accident or incident which must be reported under Part 225 and a supervisor has reasonable suspicion that his acts or omissions contributed to the accident. 49 C.F.R. § 219.301(b)(2).[8] The

(ii) Release of a hazardous material accompanied by—
(A) An evacuation; or
(B) A reportable injury resulting from the hazardous material release (*e.g.,* from fire, explosion, inhalation, or skin contact with the material); or
(iii) Damage to railroad property of $500,-000 or more.
(2) *Impact accident.* An impact accident resulting in—
(i) A reportable injury; or
(ii) Damage to railroad property of $50,000 or more.
(3) *Fatal train incident.* Any train incident that involves a fatality to any on-duty railroad employee.

**4. § 219.203 Responsibilities of railroads and employees.**
(a) *Employees tested.* (1) Following each accident and incident described in § 219.201, the railroad (or railroads) shall take all practicable steps to assure that all covered employees of the railroad directly involved in the accident or incident provide blood and urine samples for toxicological testing by FRA.

(b) *Timely sample collection.* (1) The railroad shall make every reasonable effort to assure that samples are provided as soon as possible after the accident or incident.

(c) *Place of sample collection.* (1) Employees shall be transported to an independent medical facility where the samples shall be obtained. In all cases blood shall be drawn only by a qualified medical professional or by a qualified technician subject to the supervision of a qualified medical professional.

**5. § 219.213 Unlawful refusals; consequences.**
(a) *Disqualification.* (1) An employee who refuses to cooperate in providing a blood or urine sample following an accident or incident specified in this section shall be withdrawn from covered service and shall be deemed disqualified for covered service for a period of nine (9) months.

**6. § 219.301 Testing for reasonable cause.**

.     .     .     .     .

(b) *Reasonable cause for breath tests.* The following circumstances constitute reasonable cause for the administration of breath tests under this section:
(1) *Reasonable suspicion.* A supervisory employee of the railroad has a reasonable suspicion that the employee is currently under the influence of or impaired by alcohol, or alcohol in combination with a controlled substance, based upon specific, personal observations that the supervisory employee can articulate concerning the appearance, behavior, speech or body odors of the employee.

**7. (c) *Reasonable cause for urine test—***

.     .     .     .     .

(2) *Reasonable suspicion.* Reasonable cause also exists where a supervisory employee of the railroad has a reasonable suspicion that the employee is currently under the influence of or impaired by alcohol or a controlled substance, based upon specific, personal observations that the supervisory employee can articulate concerning the appearance, behavior, speech, or body odors of the employee, subject to the following limitations:
(i) An employee may be required to submit to urine testing for reasonable suspicion only if the determination is made by at least two supervisory employees; and
(ii) If the determination to require urine testing is based upon suspicion that the employee is under the influence of or impaired by a controlled substance, at least one supervisory employee responsible for the decision to require urine testing must have received at least three (3) hours of training in the signs of drug intoxication consistent with a program of instruction on file with FRA under Part 217 of this title. Such program shall, at a minimum, provide information concerning the acute behavioral and apparent physiological effects of the major drug groups on the controlled substances list (narcotics, depressants, stimulants, hallucinogens, and marijuana).

**8. § 219.301 Testing for reasonable cause.**
(b) *Reasonable cause for breath tests.*

railroads may also require testing when an employee violates a railroad operating rule listed in 49 C.F.R. § 219.301(b)(3).[9]

There are no factual disputes in this case except as to the extent of alcohol and drug abuse in the railroad industry and the number of accidents involving either. The record shows that, between 1975 and 1984, of 791 fatalities caused by railroad employees, 37 resulted from accidents or incidents involving alcohol or drug use, or 4.7 percent. The FRA contends the problem is more serious than the 4.7 percent figure would indicate because of underreporting by the railroad industry of alcohol and drug involvement, because of the increased dangers involved in railroad transport of hazardous materials, and because drug and alcohol use has grown more pervasive in recent years.

The district court assumed the seriousness of the problem, and the RLEA concedes that alcohol and drug use are serious hazards to railroad safety. Thus, although there is some difference of opinion about just how pervasive the problem is, the central dispute in this case is not a factual one. Rather, the case involves disputes as to the statutory authority for the rule and its constitutionality.

## ANALYSIS

We review a grant of summary judgment de novo. *Darring v. Kincheloe*, 783 F.2d

874, 876 (9th Cir.1986). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986). We review questions of law de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## I. FOURTH AMENDMENT

■ To decide whether the drug tests mandated or authorized by the regulations violate the fourth amendment, we must first determine whether the amendment's prohibition of unreasonable searches and seizures applies to drug tests conducted at the instigation of the railroads pursuant to regulations adopted by the FRA. We hold that it does, both because the tests in question constitute searches within the meaning of the fourth amendment and because the federal government's role in promulgating the regulations in question is sufficient government action to subject the tests to the limitations of the fourth amendment.

## A. Drug and Alcohol Tests are Searches

The fourth amendment protects the "right of the people to be secure in their

(1) *Reasonable suspicion* (see note 5)

.    .    .    .    .

(2) *Accident/incident.* The employee has been involved in an accident or incident reportable under Part 225 of this title, and a supervisory employee of the railroad has a reasonable suspicion that the employee's acts or omissions contributed to the occurrence or severity of the accident or incident; or

9. (3) *Rule violation.* The employee has been directly involved in one of the following operating rule violations or errors:

(i) Noncompliance with a train order, track warrant, timetable, signal indication, special instruction or other director with respect to movement of a train that involves—

(A) Occupancy of a block or other segment of track to which entry was not authorized;

(B) Failure to clear a track to permit opposing or following movement to pass;

(C) Moving across a railroad crossing at grade without authorization; or

(D) Passing an absolute restrictive signal or passing a restrictive signal without stopping (if required);

(ii) Failure to protect a train as required by a rule consist with § 218.37 of this title;

(iii) Operation of a train at a speed that exceeds the maximum authorized speed by at least ten (10) miles per hour or by fifty percent (50%) of such maximum authorized speed, whichever is less;

(iv) Alignment of a switch in violation of a railroad rule or operation of a switch under a train;

(v) Failure to apply or stop short of derail as required;

(vi) Failure to secure a hand brake or failure to secure sufficient hand brakes; or

(vii) In the case of a person performing a dispatching function or block operator function, issuance of a train order or establishment of a route that fails to provide proper protection for a train.

persons, houses, papers, and effects, against unreasonable searches and seizures...." These rights are implicated only if the conduct at issue infringes " 'an expectation of privacy that society is prepared to consider reasonable.' " *O'Connor v. Ortega,* —— U.S. ——, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (plurality opinion) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). The question we must first consider is whether a railroad employee has a reasonable expectation of privacy in the personal information contained in his body fluids.

It has long been clearly settled that blood tests such as those mandated by 49 C.F.R. § 219.203 are searches within the meaning of the fourth amendment. *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966).

■ Every court that has considered the matter has similarly concluded that urine tests, such as those mandated by 49 C.F.R. § 219.203 and authorized by 49 C.F.R. § 219.301, are searches for fourth amendment purposes. *See, e.g., Everett v. Napper,* 833 F.2d 1507, 1509 (11th Cir.1987); *Jones v. McKenzie,* 833 F.2d 335, 338 (D.C. Cir.1987); *National Fed'n of Fed. Employees v. Weinberger,* 818 F.2d 935, 942 (D.C.Cir.1987); *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 176 (5th Cir.1987); *McDonell v. Hunter,* 809 F.2d 1302, 1307 (8th Cir.1987); *Division 241 Amalgamated Transit Union v. Suscy,* 538 F.2d 1264, 1266–67 (7th Cir.), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); *Amalgamated Transit Union, Local 1277 v. Sunline Transit Agency,* 663 F.Supp. 1560, 1566 (C.D.Cal. 1987); *Feliciano v. City of Cleveland,* 661 F.Supp. 578, 586 (N.D.Ohio 1987); *Lovvorn v. City of Chattanooga,* 647 F.Supp. 875, 879 (E.D.Tenn.1986); *Capua v. City of Plainfield,* 643 F.Supp. 1507, 1513 (D.N.J. 1986); *Allen v. City of Marietta,* 601 F.Supp. 482, 488–89 (N.D.Ga.1985); *Storms v. Coughlin,* 600 F.Supp. 1214, 1217–18 (S.D.N.Y.1984); *Smith v. City of East Point,* 183 Ga.App. 659, 359 S.E.2d 692

(1987). The usual rationale is that urine testing is similar to blood testing because even though urine is routinely discharged from the body it is "normally discharged and disposed of under circumstances that merit protection from arbitrary interference." *Capua,* 643 F.Supp. at 1513. Because people have reasonable expectations of privacy in the personal information body fluids contain, the governmental taking of a urine specimen constitutes a search and seizure within the meaning of the fourth amendment. *Id.*

It has also been held, with less discussion of the rationale, that breath tests are searches within the meaning of the fourth amendment. *See, e.g., Burnett v. Municipality of Anchorage,* 806 F.2d 1447, 1449 (9th Cir.1986); *Shoemaker v. Handel,* 795 F.2d 1136, 1141 (3d Cir.) (applying fourth amendment administrative search exception to urine and breath testing without explicitly deciding the testing constitutes a search), *cert. denied,* —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986).

## B. Government Action Requirement

The second question we must consider is whether the federal government's role in promulgating this regulatory scheme is sufficient to subject the tests carried out in accordance with these provisions to the limitations of the fourth amendment. FRA argues that Subpart D merely authorizes private railroads to carry out tests under certain circumstances and that there is no government action involved.

The district court rejected this argument, and FRA did not cross-appeal after prevailing in the district court. FRA may nevertheless raise the argument on appeal because it does not seek to expand the relief granted by that court. *United States v. New York Telephone Co.,* 434 U.S. 159, 166 n. 8, 98 S.Ct. 364, 369 n. 8, 54 L.Ed.2d 376 (1977). It is well settled that a prevailing party, "though he files no cross-appeal or cross-petition, may offer in support of his judgment any argument that is supported by the record, whether it was ignored by the court below or flatly rejected." 9

Moore's Federal Practice ¶ 204.11[3] (2d ed. 1985) (footnote omitted).

On the merits, the district court was correct in finding government action in the authorized testing provisions relying on the authority of *United States v. Davis*, 482 F.2d 893, 896–904 (9th Cir.1973). In *Davis* we considered the applicability of the fourth amendment to airport security searches conducted by private airline employees. We began our inquiry with the observation that the fourth amendment applies to a search whenever the government participates in any significant way in a total course of conduct leading to a search. *Id.* at 897. We pointed out that the determining factor " 'is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means.' " *Id.* (quoting *Lustig v. United States*, 338 U.S. 74, 79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949)). After reviewing the history of concern with hijacking and the development of a nationwide anti-hijacking program conceived, directed, and implemented by federal officials in cooperation with air carriers, we concluded that the government's role in the airport search program had been a dominant one. *Davis*, 482 F.2d at 897–904. We said that even if it could be characterized accurately as mere encouragement or, in the language of *United States v. Guest*, 383 U.S. 745, 755–56, 86 S.Ct. 1170, 1176–77, 16 L.Ed.2d 239 (1966), as "peripheral, or ... one of several cooperative forces leading to the [alleged] constitutional violation," it was still significant for fourth amendment purposes. *Davis*, 482 F.2d at 904. We expressly noted that it made no difference that the search was conducted by a private airline employee because the search was part of the overall, nationwide anti-hijacking effort and thus constituted "state action" for fourth amendment purposes. *Id.* It also made no difference that the search was conducted prior to the issuance of formal regulations mandating pre-boarding searches. *Id.* at 902–04.

In this case, the government's involvement in developing the rule and in regulating its implementation clearly amounts to significant involvement for fourth amend-

ment purposes. FRA's regulation was issued under the authority of the Federal Railroad Safety Act of 1970, 45 U.S.C. §§ 421–444, and the Accident Reports Act of 1910, 45 U.S.C. §§ 38–43. The Safety Act invests the Secretary of Transportation with authority to regulate "all areas of railroad safety," 45 U.S.C. § 431, and empowers him to conduct investigations, issue subpoenas, require production of documents, and delegate to qualified persons functions concerning the examination, inspecting, and testing of railroad equipment, operations, and persons, 45 U.S.C. § 437. Authority to administer the Act has been delegated to the Administrator of the FRA. 49 C.F.R. § 1.49(m).

The Accident Reports Act provides that railroads must make monthly reports to the Secretary of Transportation of all collisions, derailments or other accidents resulting in death, injury or property damage. The Secretary is authorized to investigate all railroad accidents resulting in serious injury or property damage, and, to that end, is granted certain appropriate powers, including the power to require the production of evidence and, when deemed to be in the public interest, to make reports of such investigations stating the cause of the accident. 45 U.S.C. §§ 38–40. That statute also authorizes the issuance of "such rules ... as are necessary." 45 U.S.C. § 42. The Secretary's authority under this Act too has been delegated to the Administrator of the FRA. 49 C.F.R. § 1.49(c)(11). The FRA has issued detailed accident reporting regulations, found at 49 C.F.R. Part 225.

FRA safety inspectors conduct investigations across the national rail system on a daily basis to promote compliance with safety regulations. As necessary, the FRA may require cooperation of the railroad company to facilitate the examination of facilities or pertinent records. *See United States v. Missouri Pacific R.R.*, 553 F.2d 1156 (8th Cir.1977).

FRA developed the regulations at issue here through a process initiated on June 30, 1983 and concluded August 2, 1985. FRA undertook this rulemaking process in

response to a perception that drug and alcohol abuse is a serious problem in the railroad industry posing unacceptable risks to public and employee safety. The general concern with drug and alcohol abuse and the national goal of eradicating that abuse is a matter of common knowledge. For example, the President's Commission on Organized Crime proposed that to reduce the demand for drugs "[t]he President should direct the heads of all Federal agencies to formulate immediately clear policy statements, with implementing guidelines, including suitable drug testing programs." President's Commission on Organized Crime, America's Habit: Drug Abuse, Drug Trafficking, and Organized Crime at 483 (1986). In response, the President, on September 15, 1986, issued an Executive Order for a "Drug–Free Federal Workplace." Exec. Order No. 12,564, 51 Fed. Reg. 32,889 (1986). These expressions of national concern are mirrored in FRA's effort to develop a workable program of drug testing for the railroad industry. We cannot view the testing provisions, even those which authorize testing by private railroads, as anything less than part of an overall, nationwide anti-drug campaign. *Cf. Davis*, 482 F.2d at 897. Thus the government's role in the railroad drug testing program has been a dominant one, sufficiently significant for fourth amendment purposes.

## C. Fourth Amendment Standard

Having found that the fourth amendment applies to drug and alcohol tests conducted pursuant to federal regulatory authority " 'is only to begin the inquiry into the standards governing such searches.... [W]hat is reasonable depends on the context within which a search takes place.' " *O'Connor*, 107 S.Ct. at 1499 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985)). It is generally settled that " 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.' " *O'Connor*, 107 S.Ct. at 1499 (quoting *Mancusi v.*

*DeForte*, 392 U.S. 364, 370, 88 S.Ct. 2120, 2125, 20 L.Ed.2d 1154 (1968)).

### 1. *Warrant Requirement*

■ It appears clear that this is a case in which a warrant is not required. Although a warrant is generally required to make a search reasonable, it is not the *sine qua non* of reasonableness. For example, a warrantless inspection of commercial enterprises in a closely regulated industry is reasonable within the meaning of the fourth amendment if the inspection meets certain criteria. *New York v. Burger*, —— U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). In another context the Court has held that public employer intrusions on the constitutionally protected privacy interests of government employees for work-related purposes and for investigations of work-related misconduct should be judged by the standard of reasonableness under all circumstances. *O'Connor*, 107 S.Ct. at 1502. The Court has also held that the warrant requirement is unsuited to the school environment because it would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools. *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). In general the Court has indicated that the warrant requirement is dispensed with when "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Camara v. Municipal Court*, 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967). Such an exception is carved out only when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *T.L.O.*, 469 U.S. at 351, 105 S.Ct. at 747 (Blackmun, J., concurring).

In the seminal case on body fluid testing, the Court held that compelled blood tests in a drunk driving case are constitutionally permissible without a search warrant. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The Court stated that even though the warrant requirement could be dispensed with, there still had to be probable cause to initiate such a test. It said

[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear. *Id.* at 769–70, 86 S.Ct. at 1835. The *Schmerber* Court found the blood test reasonable without a warrant because the same facts which gave probable cause for the arrest also suggested the relevance of the blood test, and because the blood test was a reasonable test with little risk, trauma or pain and was conducted in a reasonable manner. *Id.* at 770–71, 86 S.Ct. at 1835–36. RLEA concedes that a warrant is not necessary to legitimate body fluid testing under the regulations but argues that the *Schmerber* requirement for something like probable cause [10] must exist to justify the testing of any particular individual.

■ We can agree that the exigencies of testing for the presence of alcohol and drugs in blood, urine or breath require prompt action which precludes obtaining a warrant. *Schmerber*, 384 U.S. at 770, 86 S.Ct. at 1835. *Compare T.L.O.*, 496 U.S. at 340, 105 S.Ct. at 742 (to require a teacher to obtain a warrant before a search when she suspects an infraction of school rules would unduly interfere with the maintenance of discipline in the schools).

**10.** Recently the Supreme Court has explained that the "clear indication" specified in *Schmerber* was not a third standard between probable cause and reasonable suspicion, but was simply another way of stating that police must have a particularized suspicion that the evidence sought might be found within the body of the individual. *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).

**11.** Such well-defined exceptions include: (1) searches incident to a lawful arrest, *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); (2) the "automobile exception," *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); (3) hot pursuit, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); (4) stop and frisk, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); (5) plain view, *Collidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564

## 2. *Exceptions to Warrant Requirement*

Although we agree that drug and alcohol testing can be conducted without a warrant, we do not believe the case fits within one of the "carefully defined classes of cases," *Mancusi*, 392 U.S. at 370, 88 S.Ct. at 2125, previously identified by the Supreme Court as reasonable without a warrant.[11] The most relevant prior exception which is applicable in the eyes of FRA and the district court, is the administrative search. The district court specifically found that these regulations should be evaluated under the standards applicable to administrative inspections of pervasively regulated industries. *See New York v. Burger,* — U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (automobile junkyard); *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (mines); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1978) (firearms); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor).

The administrative search doctrine applied to closely regulated industries has undergone significant alterations over the years. In the first such case, the Court approved the reasonableness of warrantless searches and seizures in the liquor industry because of the long history of Congressional regulation of the industry.

(1971); (6) border searches, *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); (7) administrative searches of closely regulated industries, *New York v. Burger,* — U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); (8) inventory searches, *Illinois v. LaFayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); (9) searches of school-children's possessions at school, *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); (10) consent, *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). *See* Bookspan, *Behind Open Doors: Constitutional Implications of Government Employee Testing,* 11 Nova L.Rev. 307, 331 n. 117 (citing cases).

*Colonnade Catering,* 397 U.S. at 75–77, 90 S.Ct. at 776–77. In *Biswell,* 406 U.S. at 315–16, 92 S.Ct. at 1596, the Court approved of warrantless searches conducted pursuant to the Gun Control Act not because of a deeply rooted history of federal regulation, but because of the need for flexibility and because the prerequisite of a warrant would frustrate the goals of inspection. The Court found that owners of businesses know they are subject to inspection from the time they choose to engage in a pervasively regulated business, thus there is only a limited threat to expectations of privacy. *Id.* at 316, 92 S.Ct. at 1596. The Court has further explained, in a case treating inspection of mines, that a congressionally established regulatory scheme and a comprehensive and defined federal regulatory presence lets the owner of commercial property know that his property will be periodically inspected. *Dewey,* 452 U.S. at 603, 101 S.Ct. at 2540. Such an inspection program, in terms of certainty and regularity of application provides a constitutionally adequate substitute for a warrant. *Id.* In that case, rather than leaving the frequency and purpose of inspections to the unchecked discretion of government officers, the Act established a predictable and guided federal regulatory presence. *Id.* at 604, 101 S.Ct at 2541. When no such regulatory plan is built into the legislation regulating a specific industry, the Court has required a warrant as a condition of a reasonable search. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (OSHA inspections not directed at a specific regulated industry; warrant necessary to demonstrate an inspection conforms to an established administrative plan).

■ The most recent articulation of this exception to the warrant requirement emphasizes that warrant and probable cause requirements which fulfill the traditional fourth amendment standard of reasonableness have lessened application in the context of a closely regulated industry because the owner or operator of commercial premises in such an industry has a reduced expectation of privacy. *Burger,* 107 S.Ct. at 2643. A warrantless inspec-

tion of the commercial premises of a pervasively regulated business will be deemed to be reasonable only if three criteria are met: (1) a "substantial" government interest informs the regulatory scheme; (2) warrantless inspections must be necessary to fulfill the regulatory scheme; and (3) the inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. *Id.* at 2643–44. As a substitute for a warrant the regulatory statute must perform the two functions of a warrant: it must advise the owner of the premises that the search is made pursuant to law and has a properly defined scope and it must limit the discretion of inspecting officers. *Id.* at 2644.

■ We do not believe the administrative inspection exception is applicable to the regulatory scheme before us. All of the decisions in this line of cases have upheld warrantless searches of property, not of persons, and we decline to make such an extension in this case. The Court, in reviewing the closely regulated industry cases, has stressed that no reasonable expectation of privacy could exist "for a *proprietor* over the *stock* of such an enterprise." *Burger,* 107 S.Ct. at 2642 (quoting *Marshall,* 436 U.S. at 313, 98 S.Ct. at 1821) (emphasis added); *accord United States v. Munoz,* 701 F.2d 1293, 1299 (9th Cir.1983). *See, also, Rush v. Obledo,* 756 F.2d 713 (9th Cir.1985) (approving inspections of family day care homes in the areas where and when business is being conducted because day care centers fall within the pervasively regulated business exception); *Balelo v. Baldrige,* 724 F.2d 753, 767 (9th Cir.) (en banc) (approving government inspection of fishing vessels for violations of the Marine Mammal Protection Act, but noting that the regulation does not authorize searches of the persons, personal effects, or living quarters of the Captains and their crews, and that such searches would have to be justified independently under the fourth amendment), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); *United States v. Raub,* 637 F.2d 1205 (9th Cir.1980) (warrantless boarding of vessels

approved as authorized by statute and aspect of historical and pervasive regulation of salmon-fishing industry).

There is no question that the railroad industry has experienced a long history of close regulation. *See supra* at 581. This regulation has diminished the *owners'* and *managers'* expectations of privacy in railroad premises, but we do not believe it has diminished the individual railroad *employee's* expectation of privacy in his person or his body fluids. Although some railroad safety regulations are directed at employees, such as the hazardous materials transportation laws, 49 U.S.C. §§ 1801–1812, the vast bulk of safety legislation is directed at owners and managers of railroads, not their employees. By this we mean that the inspections and investigations to assure compliance with the regulations are directed at the premises, equipment, rolling stock and books and records of the owners and managers, not at their employees. 45 U.S.C. § 437(b). Further, the duty to comply with the regulations and the sanctions and penalties for violations of the regulations fall on the owners and managers, not their employees.[12]

We emphasize this point to distinguish the case before us from the Third Circuit's decision in *Shoemaker v. Handel,* 795 F.2d 1136, 1142 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986), which held the administrative search exception applies to warrantless breath and urine testing of jockeys in the heavily regulated horse-racing industry. Critical to the *Shoemaker* court's analysis was the fact that jockeys, as the persons engaged in the regulated activity, are the principal regulatory concern. *Id.* The regulation of horse racing in New Jersey is designed to protect the wagering public and its confidence in the integrity of the industry, and to those ends has always been geared to assuring the integrity of racetrack employees through licensing provisions and restric-

tions on employing persons convicted of a crime involving moral turpitude. *Id.* at 1141–42. In contrast, the extensive regulation of the railroad industry is designed to guarantee the safety of employees and the public and to that end has always been geared to assuring the safety and proper maintenance of equipment and facilities. Railroad employees are not licensed, nor is their employment conditioned upon the absence of a prior criminal record. The Secretary of Transportation is expressly precluded from setting standards for qualifications of railroad employees, 45 U.S.C. § 431(a), while the New Jersey Racing Commission has always had the authority to prescribe the conditions under which licenses may be issued or revoked. *Shoemaker,* 795 F.2d at 1141. Railroad safety regulations have not put railroad employees on notice that their participation in the industry reduces their legitimate expectations of privacy in the integrity of their bodies. Certainly there are industry requirements of health and fitness, but these have been matters of private negotiation between railroads and employees not matters of federal regulation. *See, e.g., Brotherhood of Locomotive Eng'rs v. Burlington N.R.R. Co.,* 838 F.2d 1087 (9th Cir. 1988).

█ Thus we conclude that the administrative inspection standard, which allows warrantless searches of the premises of pervasively regulated industries, is not applicable to searches of persons even when they are employed in those industries, unless the employees are the principal concern of the industry regulation.

We note that FRA actually argues for an extension of a broader administrative search doctrine than that developed in the pervasively regulated industry cases. FRA relies principally on *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed. 2d 930 (1967), which required a warrant based on administrative probable cause to

---

12. *See, e.g.,* 45 U.S.C. § 438 (penalties for violation of the Federal Railroad Safety Act fall on railroads); 45 U.S.C. § 64a(a)(1) (penalties for violation of the Hours of Service Act fall on railroads); 45 U.S.C. § 13 (penalties for violation of the Safety Appliance Act fall on rail-

roads); 45 U.S.C. § 34 (penalties for violation of the Boiler Inspection Act fall on railroads); 45 U.S.C. § 39 (penalties for violation of the Accident Reports Act fall on railroads); 49 U.S.C. § 26 (penalties for violating the Interstate Commerce Act fall on railroads).

inspect premises to assure compliance with fire, health and safety codes. The Court held that area code-enforcement inspections of municipal housing are reasonable because: (1) such programs have a long history of judicial and public acceptance; (2) there is no other canvassing technique which would achieve acceptable results; and (3) the inspections are neither personal in nature nor aimed at discovery of crime. *Id.* at 537, 87 S.Ct. at 1735. We think the animating principles of this case have little application to the drug testing at issue here. *Camara,* in common with the closely regulated industry cases, only approved inspections of property which are not personal in nature. *Id.*

FRA also argues that the Supreme Court and the Ninth Circuit have frequently approved of searches of persons conducted without probable cause or individualized suspicion. It cites *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (upheld brief vehicle stops at fixed checkpoints to question occupants without individual suspicion); *United States v. Des Jardins,* 747 F.2d 499, 505–06 (9th Cir.1984) (upheld pat-down search of person at border based only on minimal showing of suspicion), *partially vacated,* 772 F.2d 578 (9th Cir.1985); *McMorris v. Alioto,* 567 F.2d 897 (9th Cir.1978) (approved routine metal detector and pat-down searches of attorneys entering courthouse); *Davis,* 482 F.2d at 910–11 (approved preboarding searches of airline passengers).

We do not consider these cases to be in point. Stops for questioning, pat-down searches and magnetometer searches do not approach the degree of intrusiveness involved in toxicological testing of body fluids. The consistent rationale of the cases is that a vital governmental interest in, for example, national self-protection, *Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116, in the safety of judicial officers, *McMorris,* 567 F.2d 897, or in combatting terrorism and hijacking, *Davis,* 482 F.2d at 897, may justify a minimal intrusion. We do not consider breath, blood or urine testing to be similarly minimal intrusions. *See Storms,* 600 F.Supp. at 1220 (urinalysis entitled to same level of

scrutiny accorded body cavity searches because both offend human dignity and privacy and both are degrading); *McDonell v. Hunter,* 612 F.Supp. 1122, 1127 (D.Iowa 1985) ("[U]rine is discharged and disposed of under circumstances where the person has a reasonable and legitimate expectation of privacy." Court also found significant the interest in maintaining privacy in personal information contained in body fluids.), *aff'd as modified,* 809 F.2d 1302 (8th Cir.1987); *Tucker v. Dickey,* 613 F.Supp. 1124 (W.D.Wis.1985) (urinalyses and body cavity searches equally degrading).

We still must decide what standard governs inquiry into the reasonableness of such a drug testing program. The Supreme Court has provided some guidance for determining the applicable standard of reasonableness although it has expressly declined to address the proper standard for analyzing employee drug and alcohol testing. *O'Connor,* 107 S.Ct. at 1504 n. **.

### 3. *Reasonableness*

The Supreme Court has said that determining the "standard of reasonableness applicable to a particular class of searches requires 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *O'Connor,* 107 S.Ct. at 1499 (quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)); *National Fed'n of Fed. Employees,* 818 F.2d at 942.

In this case, on one side of the balance are the railroad employees' reasonable expectations of privacy, *T.L.O.,* 469 U.S. at 338, 105 S.Ct. at 741, *O'Connor,* 107 S.Ct. at 1497–99, and on the other side is the governmental interest in the safe and efficient operation of the railroads for the benefit of railroad employees and the public affected by that operation. *See O'Connor,* 107 S.Ct. at 1501 (government interest in efficient and proper operation of the workplace justifies search of employee's desk and files); *National Fed'n of Fed. Employees,* 818 F.2d at 942 (government inter-

est in efficient operation of the workplace offered as justification for drug testing of federal employees); *McDonell*, 809 F.2d at 1308 (government interest in determining whether prison personnel are using or abusing drugs which would affect their ability to safely perform their work may support the reasonableness determination).

We believe that accommodation of railroad employees' privacy interest with the significant safety concerns of the government does not require adherence to a probable cause requirement. *Cf. T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742. In this case, as in *T.L.O.*, the legality of the search for evidence of drug or alcohol impairment depends on the reasonableness, under all the circumstances, of the search. To be reasonable, the search must satisfy both prongs of a two-prong test. First, we must determine "whether the [search] was justified at its inception," *T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 743 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). Second, we must determine "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,'" *T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 743 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879).

### a. Justified at Inception

Finding a search justified at its inception requires a determination that there are reasonable grounds for suspecting that the search will turn up the evidence sought. In *O'Connor* this standard meant there had to be reasonable grounds for suspecting the search of an employee's office would turn up evidence that he was guilty of work-related misconduct. 107 S.Ct. at 1503. In *T.L.O.* this standard meant there had to be reasonable grounds for suspecting that the search of a student's purse would turn up evidence that the student had violated or was violating the law or school rules. 469 U.S. at 342,

105 S.Ct. at 743. In our case, this standard means there must be reasonable grounds for suspecting the search will turn up evidence the employee has violated the industry rule and federal regulation, 49 C.F.R. § 219.101, prohibiting possession or use of alcohol and controlled substances on the job and prohibiting working while under the influence of alcohol or drugs.

The Supreme Court has not determined whether "reasonable grounds for suspecting" necessarily means that there must be individualized or particularized suspicion. *O'Connor*, 107 S.Ct. at 1503; *T.L.O.*, 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8. These cases both involved searches of property,[13] not persons, and in both cases individualized suspicion did exist, but the Court refused to say that it was an irreducible minimum of a reasonable search. *O'Connor*, 107 S.Ct. at 1503; *T.L.O.*, 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8.

We hold that particularized suspicion is essential to finding toxicological testing of railroad employees justified at its inception. Accidents, incidents or rule violations, by themselves, do not create reasonable grounds for suspecting that tests will demonstrate alcohol or drug impairment in any one railroad employee, much less an entire train crew. Broad based testing, without particularized suspicion, such as that mandated by the new regulations, 49 C.F.R. §§ 219.201, 219.301(b)(2) and (3), has been frequently disapproved. *See, e.g., Amalgamated Transit Union*, 663 F.Supp. at 1568 (random testing of bus drivers unreasonable with less than reasonable suspicion); *Feliciano*, 661 F.Supp. at 589 ("a reasonable individualized suspicion that a police officer is using illicit drugs must be required for urinalysis to be reasonable"); *American Fed'n Gov't Employees v. Weinberger*, 651 F.Supp. 726 (S.D. Ga.1986) (federal police officers cannot be tested without reasonable suspicion); *Lovvorn*, 647 F.Supp. 875 (firefighters cannot

---

**13.** The holding of *T.L.O.* appears to be broader than the facts required, in that the Court said "[W]e hold today that school officials need not obtain a warrant before searching a student who is under their authority." 469 U.S. at 340,

105 S.Ct. at 742. As we have discussed, dispensing with the warrant requirement does not end the inquiry into the reasonableness of a search, which requires different degrees of suspicion to warrant different degrees of intrusion.

be tested without individualized suspicion); *Capua,* 643 F.Supp. 1507 (random testing of firemen and policemen unconstitutional); *Patchogue–Medford Congress of Teachers v. Board of Education,* 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987) (teachers cannot be tested without particularized suspicion). *But see National Treasury Employees Union,* 816 F.2d 170 (customs officials may be required to take test when they apply for certain sensitive jobs); *McDonell,* 809 F.2d 1302 (prison guards may be subjected to uniform or systematic random urine testing); *Shoemaker,* 795 F.2d 1136 (jockeys may be subjected to random urinalysis and uniform breathalyzer tests).

We think when testing is undertaken to detect drug or alcohol abuse as a means of improving the safe operation of a railroad, it poses no insuperable burden on the government to require individualized suspicion. The reasonable suspicion standard currently codified at 49 C.F.R. §§ 219.-301(b)(1) and (c)(2) is adequate to safeguard the privacy expectations of railroad employees, and we believe it should be incorporated into the mandatory testing provisions set out in 49 C.F.R. § 219.201 and the other authorized testing provisions set out in 49 C.F.R. § 219.301(b)(2) and (3).

Requiring particularized suspicion before testing for drug or alcohol impairment comports with the great weight of authority holding that a warrantless search of a person is unconstitutional without a degree of specific suspicion. "Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal...." *T.L.O.,* 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8. *See e.g. McMorris v. Alioto,* 567 F.2d 897 (9th Cir.1978) (patdown search of visitor to courthouse more intrusive than magnetometer search and can be performed only with suspicion caused by activation of magnetometer); *Thorne v. Jones,* 765 F.2d 1270, 1277 (5th Cir.1985) (reasonable suspicion standard governs strip searches of visitors to prison), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1986); *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982)

(same); *Security & Law Enforcement Employees v. Carey,* 737 F.2d 187, 204–05 (2d Cir.1984) (reasonable suspicion standard governs strip searches of correction officers); *United States v. Ogberaha,* 771 F.2d 655, 658 (2d Cir.1985) (reasonable suspicion governs strip searches at the border), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); *Henderson v. United States,* 390 F.2d 805 (9th Cir.1967) (same).

Although we hold that the testing provisions in 49 C.F.R. §§ 219.201 and 219.-301(b)(2) and (3) are constitutionally infirm because they do not meet the first prong of the reasonableness test, we turn to a consideration of the second prong.

### b. Related in Scope

The second prong of the reasonableness test is whether the search is reasonably related in scope to the circumstances which justified the interference in the first place. *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742. In *T.L.O.* the Court indicated that a search of a school child which was justified at its inception would also be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction. *Id.* at 342, 105 S.Ct. at 743. We apply this standard to the regulations as they would stand with particularized suspicion incorporated as a necessary predicate to all testing.

■ The professed purpose of the testing program is to detect current drug intoxication and impairment and thereby to improve rail safety through the deterrent effect of the testing. We see one flaw in the reasonableness of this approach to the problem. Blood and urine tests intended to establish drug use other than alcohol are not reasonably related to the stated purpose of the tests because the tests cannot measure current drug intoxication or degree of impairment. *See Jones v. McKenzie,* 833 F.2d 335, 339 (D.C.Cir.1987); Dubowski, Dr., *Drug–Use Testing: Scientific Perspectives,* 11 Nova L.Rev. 415, 526–29

(1987); Hudner, *Urine Testing for Drugs*, 11 Nova L.Rev. 553, 556–57 (1987); Joseph, *Fourth Amendment Implications of Public Sector Work Place Drug Testing*, 11 Nova L.Rev. 605, 632 (1987). Rather, the state of the art drug tests currently used can discover only the metabolites of various drugs, which are not evidence of current intoxication and may remain in the body for days or weeks after the ingestion of the drug. Joseph, *supra* at 632. For this reason we think it imperative that drug testing be undertaken only when there is individualized suspicion because the combination of observable symptoms of impairment with a positive result on a drug test would provide a sound basis for appropriate disciplinary action. The literature on drug testing is replete with references to the unreliability of results. *See Testing for Drug Use in the American Workplace: A Symposium*, 11 Nova L.Rev. (1987) *passim*. Requiring individualized suspicion would help to alleviate some of the harsh consequences of exclusive reliance on test results.

If individualized suspicion becomes a predicate for all testing the regulations should withstand scrutiny under the scope prong of the reasonableness standard. Although body fluid testing is highly intrusive, if it were occasioned only by individualized suspicion, the intrusion would not be excessive in light of the nature of the suspected rule violation. *Cf. T.L.O.*, 469 U.S. at 342, 105 S.Ct. at 743.

The manner of conducting the tests is generally reasonable in that they are performed in medical facilities. 49 C.F.R. § 219.203(c). The intrusiveness of the process of urine testing has been reduced as much as is practicable in that only personnel of the medical facility may supervise the sample collection. 49 C.F.R. § 219.305(a).

The implied consent provision, 49 C.F.R. § 219.11 [14] adds little to the reasonableness of the testing program although it does put employees on notice that they may be required to submit to such tests. *See National Treasury Employees Union*, 816 F.2d at 178. The consent feature does not add to the reasonableness in our case as it did in *National Treasury Employees Union* because there an employee could totally forego drug screening with no adverse inferences if he withdrew his application for a job transfer. *Id.* Railroad employees do not have that option.

If individualized suspicion is included in the preconditions for testing, we would conclude that the least intrusive means have been selected to meet the legitimate governmental objectives of the tests. *See id.* at 180. We are less convinced of the effectiveness of the tests in detecting drug impairment, *id.*, but think the program will serve reasonably well as a deterrence to on-the-job use of drugs and alcohol.

**D. Consent**

FRA argues the rule satisfies the fourth amendment even under the stricter standard of reasonable suspicion because of the implied consent provision in 49 C.F.R. § 219.11. It is clear that valid consent to a search eliminates the need for a warrant of probable cause. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed. 2d 497 (1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). However, when a search has been determined to be constitutionally unreasonable, the consent feature cannot save it. *National Fed'n of Fed. Employees*, 818 F.2d at 943. As one court expressed it, "advance consent to future *unreasonable* searches is not a reasonable condition of employment." *McDonell*, 612 F.Supp. at 1131 (emphasis in original).

**E. Conflicting Authority**

We are mindful that our decision may be seen as conflicting with decisions of other circuits. *E.g. National Treasury Employees Union*, 816 F.2d 170; *McDonell*, 809 F.2d 1302; *Shoemaker*, 795 F.2d 1136; *Division 241 Amalgamated Transit Union*

---

**14.** § 219.11(a) provides "Any employee who performs covered service for a railroad on or after February 10, 1986, shall be deemed to have consented to testing as required in Subpart C and D of this part; and consent is implied by performance of such service.

*v. Suscy,* 538 F.2d 1264 (7th Cir.), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976).

In *National Treasury Employees Union,* the Fifth Circuit considered a plan for testing customs officials seeking transfer to jobs which involve interdiction of illicit drugs, require carrying of a firearm or involve access to classified information. 816 F.2d at 173. As a voluntary screening test for those applying for transfers, this program is similar to FRA rules for pre-employment drug screens codified at 49 C.F.R. Part 219, Subpart F. These rules are not before us, and of course we express no opinion as to their constitutionality. We do not think the factors the Fifth Circuit considered in analyzing the reasonableness of the testing program, 816 F.2d at 177–82, are precisely the factors we consider relevant, because the court did not consider the crucial question which is the foundation of the reasonableness test, i.e., whether the search is justified at its inception, *O'Connor,* 107 S.Ct. at 1503; *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742.

Likewise, the *McDonell* court did not pose this question in analyzing and upholding the reasonableness of uniform or systematic random testing of prison guards. 809 F.2d at 1308. Rather the court simply weighed the strong interest in prison security against the urinalyses which it held to be relatively less intrusive than body searches and found the intrusion into the guards' expectation of privacy to be reasonable. *Id.* We do not agree that urine testing is a lesser intrusion than body searches.

We have already indicated that *Shoemaker* is distinguishable because the Third Circuit adopted the pervasively regulated industry rationale to uphold testing of jockeys and we do not consider that rationale applicable to the employees in our case. 795 F.2d at 1141–42.

Finally, we do not consider the analysis of the *Suscy* court to be particularly persuasive, even though the case, because it

involves bus drivers, is factually similar to the case before us. 538 F.2d 1264. The Seventh Circuit held, without very thorough analysis, that bus operators have no reasonable expectation of privacy and that even if they did, the tests given were reasonable because they were given only to operating employees directly involved in serious accidents or suspected by two supervisory employees of being under the influence. *Id.* at 1267. *See* Bible, *Screening Workers for Drugs: The Constitutional Implications of Urine Testing in Public Employment,* 24 Am. Business L.J. 309, 324–25 (1986) (criticizing *Suscy* reasoning). Our evaluation of the reasonableness of the tests at issue in this case is that they fail to meet the requirement of being justified at their inception by an expectation the tests will reveal the sought after information. Because the *Suscy* court did not apply that test, its conclusions do not influence the outcome in our case.

## II. STATUTORY ARGUMENTS

RLEA raises a number of statutory objections to the regulations which we find unpersuasive.[15] RLEA suggests that the regulations violate the Federal Railroad Safety Act in that the FRA lacks the statutory authority to delegate testing under Subpart D to the railroads, and to permit them to conduct it without particularized suspicion. This argument is without merit. 45 U.S.C. § 437(a) authorizes the Secretary to delegate to any qualified persons functions respecting examination, inspection and testing of persons as necessary to carry out the provisions of that subchapter. Thus, because the Secretary has the power to perform the searches in question here, he has the power to delegate that authority to other qualified persons.

The RLEA argues from *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), which addressed warrantless inspections to enforce OSHA, that any statutory scheme mandating warrantless searches is constitutionally infirm.

---

**15.** The district court did not reach any of these questions but because they are legal issues we

need not remand for further consideration.

*Marshall* does not go so far. The Court specifically stated it was concerned only with OSHA, and that the "reasonableness of a warrantless search ... will depend upon the specific enforcement needs and privacy guarantees of each statute." *Id.* at 321, 98 S.Ct. at 1825. Thus, the scheme at issue in this case need only pass constitutional muster on its own terms.

RLEA also argues that the regulations violate the Federal Rehabilitation Act by unlawfully discriminating against the handicapped by causing dismissal of employees who can perform their jobs despite drug or alcohol use. The Federal Rehabilitation Act prohibits discrimination against otherwise qualified handicapped individuals by any program receiving federal financial assistance. 29 U.S.C. § 794 (1982). Assuming the Act applies to railroads, since they generally receive federal assistance or have federal contracts, it is clear the testing regulations are not violative of the Rehabilitation Act.

The regulations do not mandate any discriminatory treatment of those who are handicapped, or even of those who "flunk" the drug or alcohol tests. Any disciplinary action is left up to the individual employers and is a subject for collective bargaining between the unions and railroads.

Furthermore, the Rehabilitation Act does not cover alcoholics or drug abusers whose employment, by reason of current alcohol or drug abuse, would constitute a threat to property or safety. 29 U.S.C. § 706(7)(B). It appears from the plain language of the statute that only alcoholics or drug abusers whose problems are under control are protected from discriminatory treatment.

Finally, RLEA argues that the regulations violate protections of the Railway Labor Act by denying employees the right to have union representation at the testing procedures. This argument has no merit. It derives the right to have a representative present from the Supreme Court's decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). In *Weingarten,* the Court held that an employer's refusal of an employee's request that her union representative be present at an investigatory interview which the employee reasonably believed might result in disciplinary action constituted an unfair labor practice in violation of § 8(a)(1) of the N.L.R.A., 29 U.S.C. § 158(a)(1), because it interfered with § 7 rights to engage in concerted activity. 29 U.S.C. § 157. 420 U.S. at 252–53, 95 S.Ct. at 961.

*Weingarten* does not control this case. The Court specified that the right to union representation arises only upon the employee's request. *Id.* at 257, 95 S.Ct. at 963. Here, the regulations are silent as to a person's right to have representation, and the situation has not yet arisen in which an employee has asked for and been refused such representation. Thus, the question is not ripe for review.

## III. OTHER CONSTITUTIONAL OBJECTIONS

RLEA contends that, in addition to its constitutional infirmity under the fourth amendment, the rule also impermissibly impinges on the fundamental right of privacy. *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The privacy interest protected by *Roe v. Wade* and its progeny has not been fully delineated, *see Carey v. Population Servs. Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), but thus far has been extended to include interests in autonomous decision making in the areas of family planning and contraception, *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), marriage, *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), and family living arrangements. *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). Any right to personal autonomy in choosing to use alcohol or drugs has not yet been protected, although there is a parallel right to keep certain information about drug use private. *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In *Whalen* the Court found the gathering and storage of data pertaining to prescription drug use did not pose a grievous threat to the privacy interest in avoiding disclosure of personal mat-

ters or the privacy interest in independent decision making.

The Third Circuit held that one aspect of the reasonableness of the jockey testing program was the guarantee of confidentiality incorporated in the statutory scheme. *Shoemaker*, 795 F.2d at 1144. The regulations before us lack this safeguard, but we believe the time to litigate the question is after some inappropriate breach of confidentiality.

■ RLEA's final constitutional argument is that the regulations are underinclusive and thus offend due process by arbitrarily discriminating among similarly situated classes of persons. Of course the equal protection provisions of the fourteenth amendment have been made applicable to the federal government through the due process clause of the fifth amendment. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). But equal protection requires only that there be a rational relationship between a classification scheme and a legitimate government objective. *Plyler v. Doe*, 457 U.S. 202, 216–18, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). The objective of railway safety is unquestionably legitimate. The targeting for testing of employees covered by the Hours of Service Act, 45 U.S.C. §§ 61–64b, and employees performing the same services as covered employees, 49 C.F.R. § 219.5(d), is reasonably related to the goals of the testing program. The Hours of Service employees are "individual[s] actually engaged in or connected with the movement of any train." 45 U.S.C. § 61(b)(2). Congress enacted this legislation to enhance railroad safety by regulating the hours of employees most involved in the operation and therefore most responsible for the safe operation of trains. It makes sense to mandate drug and alcohol testing of the same group for the same reasons.

But RLEA argues this does not permit testing of supervisory employees who may also be responsible for railway accidents. However, as FRA points out, supervisory personnel are already subject to testing at the discretion of the railroads, and if they perform any "covered service" they will be subject to testing under the new rule too. Thus, the rule does not offend the equal protection clause.

## CONCLUSION

Because the district court applied the wrong legal standard in evaluating the fourth amendment issue in this case, it erroneously granted summary judgment for FRA. Applying the test of reasonableness we conclude that intrusive drug and alcohol testing may be required or authorized only when specific articulable facts give rise to a reasonable suspicion that a test will reveal evidence of current drug or alcohol impairment. The judgment of the district court is REVERSED.

ALARCON, Circuit Judge, dissenting:

I respectfully dissent.

The primary issue before this court is whether the district court correctly determined that the Federal Railroad Administration's regulations requiring restraints to conduct blood or urine tests of crew members after serious accidents or incidents and authorizing the conduct of breath or urine tests, upon reasonable suspicion or upon an indication of a deficiency in an employee's safety sensitive functions as a result of an employee's involvement in certain accidents, incidents or rule violations, do not violate the fourth amendment. The district court concluded that, because railroads and railway employees are closely regulated by the government to promote public safety, the balance between this valid governmental interest and the right of an individual to be free from an invasion of privacy must be struck in favor of the regulatory scheme. I would affirm the district court's judgment.

## I

The majority has concluded that, notwithstanding that railroads are closely regulated industries, the exception to the requirement of a warrant and probable cause for searches involving closely regulated industries does not apply to the search of the

employees of such enterprises. The majority's decision is in direct conflict with the Third Circuit's opinion in *Shoemaker v. Handel,* 795 F.2d 1136 (3rd Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580. In *Shoemaker,* the court held that warrantless breathalyzer and urine tests of voluntary participants in the highly regulated horse racing industry are reasonable under the fourth amendment. The majority in the instant matter attempt to distinguish *Shoemaker* on the ground that in the regulation of horse racing, jockeys are "the principal regulatory concern." Majority op. at 585. In further support of its refusal to follow *Shoemaker,* the majority states, "[i]n contrast, the extensive regulation of the railroad industry is designed to guarantee the safety of employees and the public and to that end has always been geared to assuring the safety and proper maintenance of equipment and facilities." *Id.*

Contrary to the majority's argument, the government has a long tradition of regulating the conduct of railway personnel to promote public safety. The reason is obvious. An idle locomotive, sitting in the roundhouse, is harmless. It becomes lethal when operated negligently by persons who are under the influence of alcohol or drugs. As early as 1907, for example, Congress set limits on the number of working hours industry personnel may undertake per day. 45 U.S.C. § 62(a)(1) (1982). This legislation:

> was induced by reason of the many casualties in railroad transportation which resulted from requiring the discharge of arduous duties by tired and exhausted men whose power of service and energy had been so weakened by overwork as to render them inattentive to duty or incapable of discharging the responsible labors of their positions.

*Atchison, T. & S.F. Ry. Co. v. United States,* 244 U.S. 336, 342, 37 S.Ct. 635, 637, 61 L.Ed. 1175 (1917).

The government has promulgated a number of regulations which mandate safe working practices by railroad personnel. *See e.g.,* 49 C.F.R. §§ 218.1–218.30 (1986) (requiring that workers follow certain prescribed safety procedures when co-workers are engaged on rail tracks); 49 C.F.R. § 218.37 (1986) (requiring that workers follow certain prescribed safety procedures when trains are running at reduced speeds); 49 C.F.R. § 220.61 (1986) (requiring certain prescribed safety procedures be followed when transmitting or receiving orders). Additionally, Congress has declared that railroad personnel can be held criminally liable for violating certain safety rules. *See* 49 U.S.C. § 1801 (1982) (providing criminal penalties from the knowing transportation of hazardous materials); *see also* 45 U.S.C. § 438 (1982) (criminal penalties for false entries in accident reports).

The majority also reasons that railroad workers, unlike jockeys, do not have diminished expectations of privacy with respect to their use of drugs or alcohol. Majority op. at 585. This argument ignores the fact that railway employees were subject to safety rules such as the one denominated as Rule G in the companion cases to this matter *Brotherhood of Locomotive Eng'rs v. Burlington N. R.R. Co.,* 838 F.2d 1087 (9th Cir.1988) which, for a substantial period of time, have prohibited the use of alcohol and controlled substances by employees subject to duty or while on duty and required railway personnel suspected of use to submit to a blood or urine test to clear themselves of suspicion. *See Brotherhood of Locomotive Eng'rs v. Burlington N. R.R. Co.,* 620 F.Supp. 163, 169–72 (D.Mont.1985).

Because the activities of railway *personnel* are closely regulated to promote safety, I would adopt the well-reasoned opinion in *Shoemaker,* and hold that the closely regulated industry exception to the requirement of a warrant and probable cause applies to blood, breath, and urine tests of railway employees under the specific circumstances prescribed in the regulations challenged in this action.

II

A search of a closely-regulated industry "will be deemed to be reasonable," *New York v. Burger,* — U.S. ——, 107 S.Ct.

2636, 2643, 96 L.Ed.2d 601 (1987), if it meets the following three criteria:

First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made

. . . .

Second, the warrantless inspections must be "necessary to further [the] regulatory scheme."

. . . . .

Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant."

*Id.* 107 S.Ct. at 2644 (quoting *Donovan v. Dewey,* 452 U.S. 594, 601-03, 101 S.Ct. 2534, 2539-40, 69 L.Ed.2d 262 (1981); *see Balelo v. Baldrige,* 724 F.2d 753, 764-65 (9th Cir.1984) (en banc), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841. The searches mandated by 49 C.F.R. § 219.201 satisfy this three-pronged test.

The government has a "substantial" interest in requiring that tests be conducted to assure that railroad employees avoid drug or alcohol use which might affect their ability to perform their jobs safely. Drug usage among railroad personnel has been implicated as a potential cause of numerous train accidents which resulted in injury and death. Two such accidents are noted in the companion cases to this matter, *Brotherhood of Locomotive Eng'rs v. Burlington N. R.R. Co.,* 838 F.2d 1087. These accidents caused seven deaths and over $3 million in property damage. These tragic events were not isolated incidents. They are two examples of a long line of alcohol or drug-related tragedies. *See generally* T. Manello & F. Seaman, *Prevalence, Costs and Handling of Drinking Problems on Seven Railroads* (Department of Transportation Report No. DOT-TSC–1375, 1979). The threat posed by alcohol and drug-related railroad accidents is particularly dangerous in light of the fact that extremely hazardous materials are often transported by rail. *See generally* National Transportation Safety Board, Pub.

No. NTSB/RAR/83/05, *Railroad Accident Report—Derailment of Illinois Central Gulf Railroad Freight Train Extra 9629 East (GS-2-28) and Release of Hazardous Materials at Livingston, Louisiana, September 28, 1982* (1983) (describing an alcohol- implicated train wreck which resulted in a chemical spill requiring the evacuation of a community of 3000 persons for a period of two weeks).

Second, warrantless inspections are "necessary to further [the] regulatory scheme." *Burger,* 107 S.Ct. at 2644 (quoting *Donovan,* 452 U.S. at 600, 101 S.Ct. at 2539). As the majority recognizes, "the exigencies of testing for the presence of alcohol and drugs in blood, urine or breath require prompt action which precludes obtaining a warrant." *Cf. Schmerber v. California,* 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966) (sanctioning warrantless blood testing in drunk driving cases).

Finally, the testing procedures set out in the regulatory scheme " 'provid[e] ... constitutionally adequate substitute[s] for a warrant.' " *Burger,* 107 S.Ct. at 2648 (quoting *Donovan,* 452 U.S. at 603, 101 S.Ct. at 2540). 29 C.F.R. 219.201 *mandates* testing upon the occurrence of an accident or rule violation. Thus, railroad employees know "that the inspections to which ... [they are] subject do not constitute discretionary acts by ... official[s] but are conducted pursuant to ..." regulation. *Burger,* 107 S.Ct. at 2648.

The " 'time, place, and scope' of the inspection[s]", *id.* (quoting *United States v. Biswell,* 406 U.S. 311, 315, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972)), are brought within reasonable bounds by other provisions of the regulatory scheme. Under 49 C.F.R. § 219.205(b), testing must take place "as soon as possible" after the occurrence of an event specified in section 219.-201. Under 49 C.F.R. §§ 219.205(c) and 215.305(a), tests must be conducted by qualified independent medical personnel at independent medical facilities. Finally, regulations such as 49 C.F.R. § 219.307(2)(b) limit the scope of testing to determining whether drugs or alcohol are present in the subject's blood or urine.

The blood and urine testing program clearly satisfies the three-pronged test established in *Donovan* and *Burger*. Accordingly, I would hold that the contested regulations do not violate the fourth amendment.

### III

Reliance on the closely regulated industry exception to the fourth amendment requirement of a warrant and probable cause is *not* necessary to uphold the government's regulations requiring blood and urine tests under carefully prescribed circumstances.

To survive traditional fourth amendment scrutiny, a search must be "reasonable." *O'Connor v. Ortega,* —— U.S. ——, 107 S.Ct. 1492, 1502–03, 94 L.Ed.2d 714.

"Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the ... action was justified at its inception,' ...; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,'...."

*Id.* 107 S.Ct. at 1503 (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 742–43, 83 L.Ed.2d 720 (1985), and *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). The majority's opinion in this matter is also in conflict with decisions of the Fifth Circuit, the Seventh Circuit, the Eighth Circuit, and the District of Columbia Circuit holding that government-compelled drug-testing programs were reasonable under the fourth amendment.

Whether a search is "justified at its inception," involves a careful " 'balancing [of] the need to search ... against the invasion which the search ... entails.' " *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879 (1968) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 534–35, 87 S.Ct. 1727, 1733–34, 18 L.Ed.2d 930 (1967)). This balancing test was applied by the Fifth, Seventh, Eighth and District of Columbia Circuits to determine the reasonableness of toxicological drug testing programs in *National Treasury Employees Union v. Von Raab,* 816 F.2d 170 (5th Cir.1987), *McDonell v. Hunter,* 809 F.2d 1302 (8th Cir. 1987), and *Jones v. McKenzie,* 833 F.2d 335 (D.C.Cir.1987), and *Division 241 Amalgamated Transit Union v. Suscy,* 538 F.2d 1264 (7th Cir.1976), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632.

In *Von Raab,* a union representing employees of the Customs Service mounted a fourth amendment challenge to "a program adopted by the Customs Service requiring employees seeking transfer to certain sensitive jobs to submit to urine testing for drug use." 816 F.2d at 172. The Service initiated the program because its employees "are routinely exposed to the vast network of organized crime that is inextricably tied to illegal drug use ... as well as [to] illegal substances themselves." *Id.* at 173. Applying the balancing test, the Fifth Circuit determined that the urine tests were intrusive and undertaken without individualized suspicion, and considered these two factors weighed against finding the program reasonable. *Id.* at 175–77. The court held, however, that these factors were more than outweighed by: (1) the Service's compelling need to assure that its employees maintained integrity, *id.* at 177–78; and (2) the diminished privacy expectations of Service employees, who know from the very nature of their profession "that inquiry may be made concerning their off-the-job use of drugs," *id.* at 180. Persons involved in operating trains should also be presumed to know that inquiry concerning their off-duty drug and alcohol use is likely because of the danger to others that would flow from operating a train while under the influence of such substances.

In *McDonell,* the Iowa Department of Corrections required correctional officers to submit to urine, blood and breath testing at the request of Department officials. 809 F.2d at 1304. The Department initiated the testing program "to maintain security and intercept contraband." *Id.* at 1306. Applying the balancing test, the Eighth Circuit noted that prison employees "expectations of privacy are diminished while they are within the confines of the prison." *Id.* It found that the Department

had a compelling need to determine "whether corrections employees are using or abusing drugs which would affect their ability to safely perform their work within the prison." *Id.* at 1308. The court found this necessity outweighed the correctional officers' diminished privacy interests:

> Because the institutional interest in prison security is a central one, because urinalyses are not nearly so intrusive as body searches, ... and because this limited intrusion into the guards' expectation of privacy is, we believe, one which society will accept as reasonable, we ... hold that urinalyses may be performed uniformly or by systematic random selection of those employees who have regular contact with the prisoners on a day-to-day basis in medium or maximum security prisons.

*Id.* at 1308. Similarly, the government had a compelling need to ensure that railway employees be free of alcohol or controlled substances in propelling locomotives across this nation.

In *Jones,* a transportation worker employed by the District of Columbia school system challenged the District's mandatory urine testing program. The program was initiated in response to "repeated incidents of bizarre or dangerous drug-related behavior by drivers and attendants while on duty." At 336. Applying the balancing test, the District of Columbia Circuit held that urine tests intrude heavily upon the employees' privacy interests and thus "can be outweighed only by strong governmental concerns." *Id.* at 340. The court held, however, that the government's safety concerns were sufficiently compelling to tip the balance against these interests. *Id.* Thus, it held that the tests were justified at the inception:

> There can be no doubt whatsoever that the School System's mission of safely transporting ... children to and from school cannot be ensured if employees ... are allowed to work under the influence of illicit drugs. Any suggestion to the contrary would be preposterous.... [T]he danger to a young ... child, should she be dropped by an attendant or ignored while crossing the street, is obvious. In light of these safety concerns, we find that the School System acted pursuant to a significant and compelling governmental interest in requiring drug testing for Transportation Branch employees as a part of routine employment-related medical examinations.

*Id.* at 340 (footnote omitted). The need to prevent injury or death to pedestrians or motorists in the path of a locomotive operated by substance and alcohol abusers is equally compelling.

In *Suscy,* a bus drivers union challenged a Chicago Transit Authority requirement that "bus operators ... submit ... blood and urine tests when they are involved in 'any serious accident.' " 538 F.2d at 1266. Applying the balancing test, the Seventh Circuit held that the clash of interests weighed in favor of holding the tests constitutional: "Certainly the public interest in the safety of mass transit riders outweighs any individual interest in refusing to disclose physical evidence of intoxication or drug abuse." *Id.* at 1267.

I would adopt the analysis set forth in these cases to the matter at hand, and hold that the urine and blood examinations mandated by 49 C.F.R. § 219.201 are justified at the inception. I would also recognize that the blood and urine tests required by the regulation are intrusive and hold, nevertheless, that they can be performed in the absence of individualized suspicion. I would hold that the government's compelling need to assure railroad safety by controlling drug use among railway personnel outweighs the need to protect privacy interests. As recent history attests, locomotives in the hands of drug or alcohol-impaired employees are the substantial equivalents of time-bombs endangering the lives of thousands. The threat posed by drug or alcohol impaired railroad workers transporting hazardous materials across this nation is *far* graver than the potential danger presented by the customs officers in *Von Rabb,* the prison guards in *McDonell* or the transportation workers in *Jones* and *Suscy.*

The Supreme Court has instructed us to " 'balanc[e] the need to search ... against

the invasion which the search ... entails'" in determining whether a search is justified at the inception. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879 (emphasis added) (quoting *Camara,* 387 U.S. at 534–35, 87 S.Ct. at 1733–34). The majority in the instant matter has failed to engage in the balancing of interests required by the Court. Instead, the majority focuses solely on the degree of impairment of the workers' privacy interests. Finding that the blood and urine tests are intrusive, the majority quickly proceeds to the conclusion that the tests are not justified at the inception because they are not initiated as the result of individualized suspicion of drug or alcohol use. Majority op. at 587–588.

The second inquiry under the "reasonableness" test is whether the search is "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *O'Connor,* 107 S.Ct. at 1503 (quoting *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 743). "[A] search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive...." *T.L.O.,* 469 U.S. at 342, 105 S.Ct. at 743.

As discussed above in relation to the closely-regulated industry test, the searches mandated by 49 C.F.R. § 219.201 are not excessively intrusive. The regulatory scheme provides safeguards which bring the time and place of the testing within reasonable bounds.

The question remains whether the tests "are reasonably related to the objectives of the search." *T.L.O.,* 469 U.S. at 342, 105 S.Ct. at 743. The majority concludes that the urine tests bear no reasonable relationship to the program objective of discovering on-the-job drug or alcohol use because they are overbroad: "[T]he tests cannot measure current drug intoxication or degree of impairment. Rather, the state of the art drug tests currently used can discover only the metabolites of various drugs, which are not evidence of current intoxication and may remain in the body for days or weeks after the ingestion of the drug." Majority op. at 588–89 (citations omitted).

The regulatory scheme contains adequate safeguards to counter the problem of overbreadth. 49 C.F.R. § 219.309 (1986) requires the railroads to inform their workers of the overbreadth problem presented by urine tests, and to counsel them to take a blood test if they have ingested drugs anytime within the previous sixty days. Section 219.309(b)(2) requires that railroads provide their workers with the following notice:

> Under Federal Railroad Administration (FRA) safety regulations, you may be required to provide a urine sample after certain accidents and incidents or at any time the company reasonably suspects that you are under the influence of, or impaired by, drugs while on duty. *Because of its sensitivity, the urine test may reveal whether or not you have used certain drugs within the recent past (in a rare case, up to sixty days before the sample is collected).* As a general matter, the test cannot distinguish between recent use off the job and current impairment. However, the Federal regulations provide that if only the urine test is available, a positive finding on that test will support a presumption that you were impaired at the time the sample was taken.
>
> You can avoid this presumption of impairment by demanding to provide a blood sample at the same time the urine sample is collected. *The blood test will provide information pertinent to current impairment.* Regardless of the outcome of the blood test, if you provide a blood sample there will be no presumption of impairment from a positive urine test.
>
> *If you have used any drug off the job (other than a medication that you possessed lawfully) in the prior sixty days, it may be in your interest to provide a blood sample.* If you have not made unauthorized use of any drug in the prior sixty days, you can expect that the urine test will be negative; and you may not wish to provide a blood sample.

49 C.F.R. § 219.309(b)(2) (1986) (emphasis added).

The warning required by section 219.309 protects employees from any mistake that might result from the "sensitivity" of the urine testing procedure. The searches mandated by 49 C.F.R. § 219.201 are reasonably related to the objective of determining whether railroad workers are intoxicated on the job.

## CONCLUSION

I would affirm the judgment of the district court. The railroad industry is closely regulated because of the serious danger presented by the negligent operation of trains across this nation by alcohol or drug-impaired railway employees. Railroad industry employees have long been restricted by safety rules from ingesting alcohol or controlled substances prior to or during the operation of trains. The government has also imposed safety laws and regulations aimed at protecting the safety of the public and co-workers. Thus, railway employees have a diminished expectation of privacy concerning the detection of their alcohol or drug use.

The closely regulated industry exception to the requirements of the fourth amendment should be applied to these employers who operate the nation's railroads because of the incalculable risk to public safety posed by alcohol or drug impaired train crews. In balancing the intrusion engendered by blood and urine tests against the risk to lives and property posed by intoxicated train crews, we should hold that such searches are reasonable and consistent with the requirements of the fourth amendment.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth